ORIGINAL

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALLIED OIL & SUPPLY, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | ) ) ) ) ) ) ) ) ) | No. 03-2673C<br>COMPLAINT<br>Judge ______ |

FILED NOV 17 2003 U.S. COURT OF FEDERAL CLAIMS

Plaintiff alleges as follows:

I

Plaintiff is a Nebraska corporation with its principal place of business in Omaha, Douglas County, Nebraska.

II

This is a claim for review of a Contracting Officer's Decision arising under the Contract Disputes Act of 1978 as amended (41 U.S.C. 601-613).

III

Jurisdiction of this action is conferred on this Court by 28 U.S.C. 1491 and 41 U.S.C. §609(a)(1).

IV

On or about August 28, 1998 the Defendant acting through the United States Army Corp of Engineers contracted with Plaintiff at Omaha, Douglas County, Nebraska for the supply and delivery of turbine lubricating oil to the Fort Randall Project, Pickstown, South Dakota. A copy of the Contract, identified as Contract No. DACW45-98-P-0564, is attached as Exhibit A and is incorporated by this reference.

V

On or about October 1, 1998, a dispute arose between the United States and the Plaintiff regarding the oil supplied by the Plaintiff under the contract.

VI

On or about September 13, 2002, the United States provided a draft set of Findings of Fact to Plaintiff and a proposed Determination.

VII

On or about November 18, 2002, Contracting Officer, Phillip E. Holman, issued his final decision. A copy of the Contracting Officer's Decision is attached as Exhibit B and is incorporated by this reference.

VIII

The pertinent contract provisions identified by the Contracting Officer are:

(a) Technical Provisions, Turbine Lubricating Oil, Paragraph 2, Type of Oil;

(b) Technical Provisions, Turbine Lubricating Oil, Paragraph 3.1, Chemical and Physical Characteristics: General;

(c) Technical Provisions, Turbine Lubricating Oil, Paragraph 3.3, Chemical and Physical Characteristics: Homogeneity;

(d) Technical Provisions, Turbine Lubricating Oil, Paragraph 3.4.3, Chemical and Physical Characteristics: Governmental Testing;

(e) Technical Provisions, Table A, Chemical and Physical Requirements and Test Methods.

IX

Plaintiff contends that the following findings of the Contracting Officer's Decision are erroneous and unsubstantiated by evidence:

(a) The finding that the Plaintiff supplied new turbine lubricating oil and replacement oil that failed to meet the emulsion requirements of the Contract.

(b) The finding that the oil supplied by Allied was the cause of damage sustained by the United States.

(c) The finding that Allied, not its subcontractor, Warren Distribution, Inc. is liable to the United States.

(d) The finding that the oil supplied by Allied was the cause of alleged damage sustained by the United States.

(e) The finding that Allied is responsible for the action of its subcontractor, Warren Distribution, Inc.

(f) The finding that the United States has been damaged in the amount of $658,406.95.

(g) The finding that the United States is entitled to lost revenue.

WHEREFORE, Plaintiff prays for this Court to declare that Plaintiff is not liable to the Defendant for any damages under the Contract which is the subject of the Contracting Officer's Decision or, in the alternative, that the government is not entitled to lost revenue as determined by the Contracting Officer and that the Plaintiff be awarded its costs incurred in prosecuting this action.

DATED this 13th day of November, 2003.

ALLIED OIL & SUPPLY, INC., Plaintiff

BY: ______________________

For: NOLAN, OLSON, HANSEN,
FIEBER & LAUTENBAUGH, LLP
The Exchange Building
1905 Harney Street, Suite 800
Omaha, Nebraska 68102
(402) 342-6233
(402) 342-9362
Brian D. Nolan
Susan L. Stryker

# SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS

OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30

1. REQUISITION NUMBER: W59XQG-8223-8... VENDOR - YOUR COPY PLEASE READ CAREFULLY — PAGE OF 4

2. CONTRACT NO.: DACW45-98-P-0564
3. AWARD/EFFECTIVE DATE: 08/28/98
4. ORDER NUMBER:
5. SOLICITATION NUMBER: DACW45-98-T-0198
6. SOLICITATION ISSUE DATE:
7. FOR SOLICITATION INFORMATION CALL: a. NAME / b. TELEPHONE NUMBER (No collect calls)
8. OFFER DUE DATE/LOCAL TIME

9. ISSUED BY — CODE CEMROCT
US ARMY CORPS OF ENGINEERS
CONTRACTING DIV (CT)
215 NORTH 17TH STREET
OMAHA NE 68102-4978

Lee McCormick
(402) 221-4045

10. THIS ACQUISITION IS
☐ UNRESTRICTED
☐ SET ASIDE: % FOR
☐ SMALL BUSINESS
☐ SMALL DISADV. BUSINESS
☐ 8(A)
SIC:
SIZE STANDARD:

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
☐ SEE SCHEDULE

12. DISCOUNT TERMS
00.000%
Days 0
Net 30

☐ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING
14. METHOD OF SOLICITATION ☐ RFQ ☐ IFB ☐ RFP

15. DELIVER TO — CODE G6R0DT2
FT RANDALL PRJT OFC TEC SPT SC
P.O. BOX 199
PICKSTOWN, SD 57367-0019

16. ADMINISTERED BY — CODE CEMROCT
US ARMY CORPS OF ENGINEERS
CONTRACTING DIV (CT)
215 NORTH 17TH STREET
OMAHA NE 68102-4978

DUPLICATE ORIGINAL

17a. CONTRACTOR/OFFEROR — CODE 00003300 — FACILITY CODE
ALLIED OIL & SUPPLY INC
2209 SO 24 ST
OMAHA NE 68108
Phone (402)344-4343

18a. PAYMENT WILL BE MADE BY — CODE T080200
USACE FINANCE CENTER
7800 THIRD AVENUE
MILLINGTON TN 38054-5005

☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED ☐ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| 0001 | SUPPLY & DELIVER TURBINE LUBRICATING OIL TO FORT RANDALL PROJECT, PICKSTOWN, SOUTH DAKOTA IN ACCORDANCE WITH THE TECHNICAL PROVISIONS.<br><br>PERFOMANCE BEGINS APPROX. SEPT. 14, 1998<br><br>(Attach Additional Sheets as Necessary) | 1.00 | LS | 47460.000000 | 47460.00 |

VENDOR - YOUR COPY
PLEASE READ CAREFULLY

25. ACCOUNTING AND APPROPRIATION DATA
96X3123000 082417 2600002CL2006270 NA 96252 Award Oblig Amt US$ 47,460.00

26. TOTAL AWARD AMOUNT (For Govt. Use Only) $ 47,460.00

☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED.
☒ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☐ ARE ☒ ARE NOT ATTACHED.

☐ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN.

☐ 29. AWARD OF CONTRACT: REFERENCE OFFER DATED 08/21/98, YOUR OFFER ON SOLICITATION (BLOCK 5) INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR

31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) Patricia M. Scornavacca

30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT)
30c. DATE SIGNED

31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT) Patricia M. Scornavacca kls
31c. DATE SIGNED 29 Aug 98

32a. QUANTITY IN COLUMN 21 HAS BEEN ☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED

33. SHIP NUMBER — PARTIAL / FINAL
34. VOUCHER NUMBER
35. AMOUNT VERIFIED CORRECT FOR

32b. SIGNATURE OF AUTHORIZED GOVT. REPRESENTATIVE
32c. DATE

36. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐ FINAL
37. CHECK NUMBER
38. S/R ACCOUNT NUMBER
39. S/R VOUCHER NUMBER
40. PAID BY

41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT
41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER
41c. DATE

42a. RECEIVED BY (Print)
42b. RECEIVED AT (Location)
42c. DATE REC'D (YY/MM/DD)
42d. TOTAL CONTAINERS

DUPLICATE ORIGINAL

EXHIBIT "A"

AUTHORIZED FOR LOCAL REPRODUCTION — SEE REVERSE FOR OMB CONTROL NUMBER AND PAPERWORK BURDEN STATEMENT — STANDARD FORM 1449 (10-95) Prescribed by GSA FAR (48 CFR) 53.212

DACW45-98-P-0564

TECHNICAL POINT OF CONTACT: RON BOCKERMAN (402) 221-4197
ON-SITE POINT OF CONTACT: RON GALL (605) 487-7845 X3004

INVOICE TO:
US ARMY CORPS OF ENGINEERS
FT RANDALL PROJECT
ATTN: CHERYL SPECKETER
PO BOX 199
PICKSTOWN, SD 57367-0199

DELIVER TO:
US ARMY CORPS OF ENGINEERS
FT RANDALL PROJECT
US HWY 281 & 18
PICKSTOWN, SD 57367

LUMP SUM (LS) PRICE INCLUDES DELIVERY OF 24,000 GALLONS OF TURBINE OIL IN TRAILERS, 2750 GALLONS IN 55-GALLON BARRELS, & REMOVAL OF APPROX. 26,000 GALLONS OF USED OIL.

CONTRACTOR IS REQUIRED TO INCLUDE CONTRACT NUMBER ON ALL INVOICES/ PACKING SLIPS SO THAT RECEIPT AND PAYMENT FOR THE OIL MAY BE EXPEDITIOUSLY PROCESSED.

PARTIAL PAYMENTS ARE AUTHORIZED.

STATE & LOCAL TAXES (JAN 1982)
THE U.S. ARMY CORPS OF ENGINEERS IS EXEMPT FROM PAYING STATE AND LOCAL TAXES PER TITLE 4 UNITED STATES CODE 104-107.

PAYMENT TO BE MADE WITHIN 30 DAYS AFTER RECEIPT OF A PROPER INVOICE OR RECEIPT OF ACCEPTABLE SUPPLIES OR SERVICES, WHICHEVER IS LATER.

52.252-1 SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998)

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at these addresses:

http://www.arnet.gov/far
http://farsite.hill.af.mil
http://www.dtic.mil/dfars

(End of provision)

52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at these addresses:

http://www.arnet.gov/far
http://farsite.hill.af.mil
http://www.dtic.mil/dfars

(End of clause)

52.222-3 CONVICT LABOR (AUG 1996)
(Reference 22.202)

52.222-20 WALSH-HEALEY PUBLIC CONTRACTS ACT (DEC 1996)
(Reference 22.610)

52.222-26 EQUAL OPPORTUNITY (APR 1984)
(Reference 22.810(e))

52.222-35 AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998)
(Reference 22.1308)

| | |
|---|---|
| 52.222-36 | AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (JUN 1998)<br>(Reference 22.1408(a)) |
| 52.222-37 | EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998)<br>(Reference 22.1308(b)) |
| 52.225-3 | BUY AMERICAN ACT--SUPPLIES (JAN 1994)<br>(Reference 25.109(d)) |
| 52.232-1 | PAYMENTS (APR 1984)<br>(Reference 32.111(a)(1) |
| 52.232-11 | EXTRAS (APR 1984)<br>(Reference 32.111(d)(2) |
| 52.232-23 | ASSIGNMENT OF CLAIMS (JAN 1986)<br>(Reference 32.806(a)(1) |
| 52.232-25 | PROMPT PAYMENT (JUN 1997)<br>(Reference 32.908(c)) |
| 52.243-1 | CHANGES--FIXED-PRICE (AUG 1987)<br>(Reference 43.205(a)(1) |
| 52.249-1 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SHORT FORM) (APR 1984)<br>(Reference 49.502(a)(1) |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984)<br>(Reference 49.504(a)(1) |

TECHNICAL PROVISIONS
TURBINE LUBRICATING OIL
RFQ # DACW45-98-T-0198

1. SCOPE: This specification covers mineral oil for use in hydraulic turbine and generator bearings, hydraulic-turbine governors, Kaplan turbine hubs, and other applications where high grade lubricating oil having anti-corrosion, anti-oxidation, and anti-foaming properties is required.

1.1 References: The Publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM D 92 | (1990) Flash and Fire Points by Cleveland Open Cup |
| ASTM D 95 | (1983; R 1990) Water in Petroleum Products and Bituminous Materials by Distillation |
| ASTM D 97 | (1987; E1) Pour Point of Petroleum Oils |
| ASTM D 130 | (1988) Detection of Copper Corrosion from Petroleum Products by the Copper Strip Tarnish Test |
| ASTM D 287 | (1992) API Gravity of Crude Petroleum and Petroleum and Petroleum Products (Hydrometer Method) |
| ASTM D 445 | (1988) Kinematic Viscosity of Transparent and Opaque Liquids (and the Calibration of Dynamic Viscosity) |
| ASTM D 665 | (1992) Rust-Preventing Characteristics of Inhibited Mineral Oil in the Presence of Water |
| ASTM D 892 | (1992) Forming Characteristics of Lubricating Oils |
| ASTM D 943 | (1981; R 1991) Oxidation Characteristics of Inhibited Mineral Oils |
| ASTM D 974 | (1992) Acid and Base Number by Color-Indicator Titration |
| ASTM D 1401 | (1991) Water Separability of Petroleum Oils and Synthetic Fluids |
| ASTM D 1500 | (1991) ASTM Color of Petroleum Products (ASTM Color Scale) |
| ASTM D 2270 | (1993) Calculating Viscosity Index from Kinematic Viscosity at 40 and 100 Degrees C |
| ASTM D 2272 | (1985; R 1991) Oxidation Stability of Steam Turbine Oils by Rotating Bomb |
| ASTM D 4057 | (1988; E1) Manual Sampling of Petroleum and Petroleum Products (API MPMS Chapter 8.1) |
| ASTM D 4177 | (1982; R 1990) Automatic Sampling of Petroleum and Petroleum Products (API MPMS 8.2) |

1.2 SUBMITTALS: The Contractor shall submit product data sheets and certified test results to the following address for approval by the Government a minimum of 10 calendar days prior to oil delivery:

U S Army Corps Of Engineers
Operations Division CENWO-OD-TM
215 North 17th Street
Omaha, NE 68059
Attn R W Bockerman

2. TYPE OF OIL: The turbine lubricating oil furnished under these specifications shall be a blend of virgin petroleum-base lubricating oil stocks plus additive agents to meet the requirements of these specifications. Additives shall not contain chlorine or zinc materials. Additive components contained in the finished lubricating oil shall be the same as those in the sample tested and granted qualification approval. All oil furnished under the requirements of this contract shall be the product of a single petroleum company.

3. CHEMICAL AND PHYSICAL CHARACTERISTICS:

3.1. General. The finished lubricating oil furnished under these specifications shall be tested by and at the Contractor's expense and shall meet the test values listed in TABLE 1 at the point of delivery. The oil shall also meet the requirements of paragraphs DEGRADATION and HOMOGENEITY. The Government will take samples at the point of delivery and will perform such tests as are deemed necessary to determine whether the oil meets the specifications. Oil failing to meet the requirements shall be replaced by and at the expense of the Contractor.

3.2. Degradation. The quality of the oil shall not be appreciably degraded (changed) by filtration through mechanical type filters, by centrifugal purification or by vacuum type purifier, all of which have been designed for lubricating oil.

3.3. Homogeneity. Additive agents shall remain uniformly distributed throughout the oil at all temperatures above the pour point and up to 120 degrees C (250 degrees F). When the oil is cooled below the pour point, it shall gain homogeneity on standing at temperatures of 5 degrees C (10 degrees F) above the pour point.

3.4. Sampling And Testing.

3.4.1. Sampling - Samples for testing shall be obtained as specified in ASTM D 4057 or ASTM D 4177 and in accordance with paragraph CHEMICAL AND PHYSICAL CHARACTERISTICS.

CHEMICAL AND PHYSICAL REQUIREMENTS AND TEST METHODS TABLE A

| CHARACTERISTICS | REQUIREMENTS FOR ISO 68 | ASTM TEST METHOD |
|---|---|---|
| Gravity, API, 15.56 degrees C (60 degrees F) | Report | D 287 |
| Viscosity | | D 445 |
| SUS at 37.78 degrees C (100 degrees F) | Report | |
| SUS at 98.89 degrees C (210 degrees F) | Report | |
| Centistokes at 40 degrees C (104 degrees F) | 61.2 - 74.8 | |
| Centistokes at 100 degrees C (212 degrees F) | Report | |
| Viscosity Index, minimum | 90 | D 2270 |
| Pour Point, maximum degrees C (degrees F) | -7 (20) | D 97 |
| Flash Point, minimum degrees C (degrees F) | 204 (400) | D 92 |
| Color | Report | D 1500 |
| Neutralization No., maximum reported as total acid No. (TAN) | 0.2 | D 974 |
| Oxidation test; time required in hours to reach neutralization value of 2.0 mg KOH, minimum | 1,000* | D 943 |
| Rotating Bomb Oxidation test (RBOT), Minutes minimum | 200 | D 2272 |
| Rust-prevention test, Procedure A&B 24 hr | Pass | D 665 |
| Water | No free Water** | D 95 |
| Emulsion test, minutes for complete Separation, maximum | 30*** | D 1401 |

| | | |
|---|---|---|
| Foaming Characteristics | | D 892 |
| After 5 minute blowing period: | | |
| Sequence 1, foam volume, ml max. | 150 | |
| Sequence 2, foam volume, ml max. | 50 | |
| Sequence 3, foam volume, ml max. | 150 | |
| After 10 minute settling period | | |
| Sequence 1, foam volume, ml max. | 50 | |
| Sequence 2, foam volume, ml max. | 10 | |
| Sequence 3, foam volume, ml max. | 50 | |
| Corrosion, copper-strip, 3 hours at 100 degrees C | Pass 1 | D 130 |

*At the conclusion of the 1,000 hour test, in addition to determining the neutralization value, the oil and water phases shall be examined for evidence of sludge and catalyst metal corrosion. **NOTE: Due to the length of time required to perform this test, the Government will accept certified test data showing that this test has been previously completed (and all the requirements met) using oil of the same manufacture, composition, and designation, as that furnished under this contract.**

**Oil must be clear and bright.

***A 3 ml emulsion cuff is acceptable.

**CONFIDENTIAL**
**QUOTATION**
**FOR**

Allied Oil & Supply
2209 South 24 th
Omaha, NE

**Date:** August 20, 1998

**To:** Don Bussenbark

**From:** Tim Weeda

**Payment Terms:** Net 30

**Freight Terms:** Collect, FOB Council Bluffs, IA

**Prices Effective:** With Orders Placed On or After 8/20/98

| Warren Item Number | Customer Stock Number | Description | Pack Size | Each Price | Case Price |
|---|---|---|---|---|---|
| TBD | | R & O ISO 68 Turbine Oil | Bulk | $1.35 | |
| | | | | | |
| | | Please notify me ASAP when you win | | | |
| | | the bid so we can complete the set up | | | |
| | | testing and blending. | | | |
| | | | | | |
| | | Good Luck! | | | |

Orders placed without a requested ship data are shipped with next Pace routing zone delivery or within five business days on common carrier. For seasonal products, a firm requested ship date is required ten working days prior to delivery date, or Warren Distribution will ship with five days notice, unless customer is notified otherwise. For orders filled at 92% fill rate or less, customer will be notified prior to delivery. All prices subject to change without notice.

Tim Weeda, Commodities Manager

cc: Carol Perry, WD
Customer Service, WD

QFCGN006A

08/20/1998 11:32 FROM NO TO 93444986 P.01

# REQUEST FOR QUOTATION
(THIS IS NOT AN ORDER)

THIS RFQ [X] IS [ ] IS NOT A SMALL BUSINESS SET-ASIDE

PAGE 1 OF PAGES 7

| 1. REQUEST NO. | 2. DATE ISSUED | 3. REQUISITION/PURCHASE REQUEST NO. | 4. CERT. FOR NAT. DEF. UNDER BDSA REG. 2 AND/OR DMS REG. 1 | RATING |
|---|---|---|---|---|
| DACW45-98-T-0198 | 08/12/98 | W59XQG-8223-6488 | | |

5A. ISSUED BY
US ARMY CORPS OF ENGINEERS
CONTRACTING DIV (CT)
215 NORTH 17TH STREET
OMAHA NE 68102-4978

6. DELIVER BY (Date)
09/16/98

7. DELIVERY
[X] FOB DESTINATION [ ] OTHER (See Schedule)

5B. FOR INFORMATION CALL (NO COLLECT CALLS)
Lee McCormick B6B (402) 221-4045

8. TO:

9. DESTINATION
US ARMY CORPS OF ENGINEERS
FORT RANDALL PROJECT
PICKSTOWN, SOUTH DAKOTA

10. PLEASE FURNISH QUOTATIONS TO THE ISSUING OFFICE IN BLOCK 5A ON OR BEFORE CLOSE OF BUSINESS (Date)
08/24/98

IMPORTANT: This is a request for information, and quotations furnished are not offers. If you are unable to quote, please so indicate on this form and return it to the address in Block 5A. This request does not commit the Government to pay any costs incurred in the preparation of the submission of this quotation or to contract for supplies or services. Supplies are of domestic origin unless otherwise indicated by quoter. Any representations and/or certifications attached to this Request for Quotations must be completed by the quoter.

## 11. SCHEDULE (Include applicable Federal, State and local taxes)

| ITEM NO. (a) | SUPPLIES/SERVICES (b) | QUANTITY (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) |
|---|---|---|---|---|---|
| | PLEASE SEND QUOTATION TO THE ATTENTION OF LEE McCORMICK, ADDRESS IN BLOCK 5A, OR FAX TO (402) 221-4199.<br><br>TECHNICAL POINT OF CONTACT:<br>RON BOCKERMAN (402) 221-4197 | | | | |
| 0001 | SUPPLY & DELIVER TURBINE LUBRICATING OIL TO FORT RANDALL PROJECT, PICKSTOWN, SOUTH DAKOTA IN ACCORDANCE WITH THE ATTACHED TECHNICAL PROVISIONS. LUMP SUM (LS) PRICE SHOULD INCLUDE DELIVERY OF 24,000 GALLONS OF OIL IN TRACTOR TRAILERS, 2750 GALLONS IN 55 GALLON BARRELS, AND DISPOSAL OF 26,500 GALLONS OF IN-SERVICE OIL. | 1.00 | LS | ______.____ | $41,905.00 |

| 12. DISCOUNT FOR PROMPT PAYMENT | a. 10 CALENDAR DAYS (%) | b. 20 CALENDAR DAYS (%) | c. 30 CALENDAR DAYS (%) | d. CALENDAR DAYS NUMBER | PERCENTAGE |
|---|---|---|---|---|---|
| | | | NeT | 30 | Net |

NOTE: Additional provisions and representations [X] are [ ] are not attached.

13. NAME AND ADDRESS OF QUOTER
a. NAME OF QUOTER: Allied Oil + Supply, Inc
b. STREET ADDRESS: 2209 So 24th ST.
c. COUNTY: Douglas
d. CITY: Omaha
e. STATE: Ne
f. ZIP CODE: 68108

14. SIGNATURE OF PERSON AUTHORIZED TO SIGN QUOTATION: [signature]

15. DATE OF QUOTATION: 8/21/98

16. SIGNER
a. NAME (Type or print): Charles Kilstrom
b. TELEPHONE
AREA CODE: 402 - 344-4343
NUMBER:
c. TITLE (Type or print): SALes

CONTRACTOR IS REQUIRED TO INCLUDE CONTRACT NUMBER ON ALL INVOICES/ PACKING SLIPS SO THAT RECEIPT AND PAYMENT FOR THE OIL MAY BE EXPEDITIOUSLY PROCESSED.

PARTIAL PAYMENTS ARE AUTHORIZED.

STATE & LOCAL TAXES (JAN 1982)
THE U.S. ARMY CORPS OF ENGINEERS IS EXEMPT FROM PAYING STATE AND LOCAL TAXES PER TITLE 4 UNITED STATES CODE 104-107.

PAYMENT TO BE MADE WITHIN 30 DAYS AFTER RECEIPT OF A PROPER INVOICE OR RECEIPT OF ACCEPTABLE SUPPLIES OR SERVICES, WHICHEVER IS LATER.

52.252-1 SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998)

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at these addresses:

http://www.arnet.gov/far
http://farsite.hill.af.mil
http://www.dtic.mil/dfars

(End of provision)

52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at these addresses:

http://www.arnet.gov/far
http://farsite.hill.af.mil
http://www.dtic.mil/dfars

(End of clause)

52.203-3 GRATUITIES (APR 1984)
(Reference 3.202)

52.204-3 TAXPAYER IDENTIFICATION (JUN 1997)

(a) Definitions.

"Common parent," as used in this solicitation provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the offeror is a member.

"Corporate status," as used in this solicitation provision, means a designation as to whether the offeror is a corporate entity, an unincorporated entity (e.g., sole proprietorship or partnership), or a corporation providing medical and health care services.

"Taxpayer Identification Number (TIN)," as used in this solicitation provision, means the number required by the IRS to be used by the offeror in reporting income tax and other returns.

(b) All offerors are required to submit the information required in paragraphs (c) through (e) of this solicitation provision in order to comply with reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M and implementing regulations issued by the Internal Revenue Service (IRS). If the resulting contract is subject to the reporting requirements described in FAR 4.903, the failure or refusal by the offeror to furnish the information may result in a 31 percent reduction of payments otherwise due under the contract.

(c) Taxpayer Identification Number (TIN).

/X/ TIN: 47-0440694.

/_/ TIN has been applied for.

/_/ TIN is not required because:

/_/ Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the U.S. and does not have an office or place of business or a fiscal paying agent in the U.S.;

/_/ Offeror is an agency or instrumentality of a foreign government;

/_/ Offeror is an agency or instrumentality of a Federal, state, or local government;

/_/ Other. State basis. ____________________

(d) Corporate Status.

/_/ Corporation providing medical and health care services, or engaged in the billing and collecting of payments for such services;

/X/ Other corporate entity;

/_/ Not a corporate entity;

/_/ Sole proprietorship

/_/ Partnership

/_/ Hospital or extended care facility described in 26 CFR 501(c)(3)

that is exempt from taxation under 26 CFR 501(a).

(e) Common Parent.

/_/ Offeror is not owned or controlled by a common parent as defined in paragraph (a) of this provision.

/_/ Name and TIN of common parent:

Name ______________________________

TIN ______________________________

(End of provision)

252.204-7001 COMMERCIAL AND GOVERNMENT ENTITY (CAGE) CODE REPORTING (DEC 1991) (Reference 04.602-70)

52.219-1 SMALL BUSINESS PROGRAM REPRESENTATIONS (FEB 1998)

(a)(1) The standard industrial classification (SIC) code for this acquisition is 2992

(2) The small business size standard is 500 employees.

(3) The small business size standard for a concern which submits an offer in its own name, other than on a construction or service contract, but which proposes to furnish a product which it did not itself manufacture, is 500 employees.

(b) Representations. (1) The offeror represents as part of its offer that it [X] is, [ ] is not a small business concern.

(2) (Complete only if offeror represented itself as a small business concern in paragraph (b)(1) of this provision.) The offeror represents as part of its offer that it [ ] is, [X] is not a small disadvantaged business concern.

(3) (Complete only if offeror represented itself as a small business concern in paragraph (b)(1) of this provision.) The offeror represents as part of its offer that it [ ] is, [X] is not a women-owned small business concern.

(c) Definitions. "Joint venture," for purposes of a small disadvantaged business (SDB) set-aside or price evaluation preference (as prescribed at 13 CFR 124.321), is a concern that is owned and controlled by one or more socially and economically disadvantaged individuals entering into a joint venture agreement with one or more business concerns and is considered to be affiliated for size purposes with such other concern(s). The combined annual receipts or employees of the concerns entering into the joint venture must meet the applicable size standard corresponding to the SIC code designated for the contract. The majority of the venture's earnings must accrue directly to the socially and economically disadvantaged

individuals in the SDB concern(s) in the joint venture. The percentage of the ownership involvement in a joint venture by disadvantaged individuals must be at least 51 percent.

"Small business concern," as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and the size standard in paragraph (a) of this provision.

"Small disadvantaged business concern," as used in this provision, means a small business concern that (1) is at least 51 percent unconditionally owned by one or more individuals who are both socially and economically disadvantaged, or a publicly owned business having at least 51 percent of its stock unconditionally owned by one or more socially and economically disadvantaged individuals, and (2) has its management and daily business controlled by one or more such individuals. This term also means a small business concern that is at least 51 percent unconditionally owned by an economically disadvantaged Indian tribe or Native Hawaiian Organization, or a publicly owned business having at least 51 percent of its stock unconditionally owned by one or more of these entities, which has its management and daily business controlled by members of an economically disadvantaged Indian tribe or Native Hawaiian Organization, and which meets the requirements of 13 CFR Part 124.

"Women-owned small business concern," as used in this provision, means a small business concern--

(1) Which is at least 51 percent owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) Notice. (1) If this solicitation is for supplies and has been set aside, in whole or in part, for small business concerns, then the clause in this solicitation providing notice of the set-aside contains restrictions on the source of the end items to be furnished.

(2) Under 15 U.S.C. 645(d), any person who misrepresents a firm's status as a small or small disadvantaged business concern in order to obtain a contract to be awarded under the preference programs established pursuant to sections 8(a), 8(d), 9, or 15 of the Small Business Act or any other provision of Federal law that specifically references section 8(d) for a definition of program eligibility, shall--

(i) Be punished by imposition of fine, imprisonment, or both;

(ii) Be subject to administrative remedies, including suspension and debarment; and

(iii) Be ineligible for participation in programs conducted under the

authority of the Act.

(End of provision)

| | | |
|---|---|---|
| 52.222-3 | CONVICT LABOR (AUG 1996)<br>(Reference 22.202) |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT (DEC 1996)<br>(Reference 22.610) |
| 52.222-26 | EQUAL OPPORTUNITY (APR 1984)<br>(Reference 22.810(e)) |
| 52.222-35 | AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998)<br>(Reference 22.1308) |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS (APR 1984)<br>(Reference 22.1408) |
| 52.222-37 | EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998)<br>(Reference 22.1308(b)) |
| 52.225-3 | BUY AMERICAN ACT--SUPPLIES (JAN 1994)<br>(Reference 25.109(d)) |
| 52.232-1 | PAYMENTS (APR 1984)<br>(Reference 32.111(a)(1) |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT (MAY 1997)<br>(Reference 32.111(c)(1) |

| | | |
|---|---|---|
| 52.232-11 | EXTRAS (APR 1984)<br>(Reference 32.111(d)(2) |
| 52.232-23 | ASSIGNMENT OF CLAIMS (JAN 1986)<br>(Reference 32.806(a)(1) |
| 52.232-25 | PROMPT PAYMENT (JUN 1997)<br>(Reference 32.908(c)) |
| 52.243-1 | CHANGES--FIXED-PRICE (AUG 1987)<br>(Reference 43.205(a)(1) |
| 52.249-1 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SHORT FORM) (APR 1984)<br>(Reference 49.502(a)(1) |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984)<br>(Reference 49.504(a)(1) |

# TECHNICAL PROVISIONS
# TURBINE LUBRICATING OIL

1. SCOPE: This specification covers mineral oil for use in hydraulic turbine and generator bearings, hydraulic-turbine governors, Kaplan turbine hubs, and other applications where high grade lubricating oil having anti-corrosion, anti-oxidation, and anti-foaming properties is required.

1.1 References: The Publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM D 92 | (1990) Flash and Fire Points by Cleveland Open Cup |
| ASTM D 95 | (1983; R 1990) Water in Petroleum Products and Bituminous Materials by Distillation |
| ASTM D 97 | (1987; E1) Pour Point of Petroleum Oils |
| ASTM D 130 | (1988) Detection of Copper Corrosion from Petroleum Products by the Copper Strip Tarnish Test |
| ASTM D 287 | (1992) API Gravity of Crude Petroleum and Petroleum and Petroleum Products '(Hydrometer Method) |
| ASTM D 445 | (1988) Kinematic Viscosity of Transparent and Opaque Liquids (and the Calibration of Dynamic Viscosity) |
| ASTM D 665 | (1992) Rust-Preventing Characteristics of Inhibited Mineral Oil in the Presence of Water |
| ASTM D 892 | (1992) Forming Characteristics of Lubricating Oils |
| ASTM D 943 | (1981; R 1991) Oxidation Characteristics of Inhibited Mineral Oils |
| ASTM D 974 | (1992) Acid and Base Number by Color-Indicator Titration |
| ASTM D 1401 | (1991) Water Separability of Petroleum Oils and Synthetic Fluids |
| ASTM D 1500 | (1991) ASTM Color of Petroleum Products (ASTM Color Scale) |
| ASTM D 2270 | (1993) Calculating Viscosity Index from Kinematic Viscosity at 40 and 100 Degrees C |
| ASTM D 2272 | (1985; R 1991) Oxidation Stability of Steam Turbine Oils by Rotating Bomb |
| ASTM D 4057 | (1988; E1) Manual Sampling of Petroleum and Petroleum Products (API MPMS Chapter 8.1) |
| ASTM D 4177 | (1982; R 1990) Automatic Sampling of Petroleum and Petroleum Products (API MPMS 8.2) |

1.2 SUBMITTALS: The Contractor shall submit product data sheets and certified test results to the following address for approval by the Government a minimum of 10 calendar days prior to oil delivery:

U S Army Corps Of Engineers
Operations Division CENWO-OD-TM
215 North 17th Street
Omaha, NE 68059
Attn R W Bockerman

2. TYPE OF OIL: The turbine lubricating oil furnished under these specifications shall be a blend of virgin petroleum-base lubricating oil stocks plus additive agents to meet the requirements of these specifications. Additives shall not contain chlorine or zinc materials. Additive components contained in the finished lubricating oil shall be the same as those in the sample tested and granted qualification approval. All oil furnished under the requirements of this contract shall be the product of a single petroleum company.

3. CHEMICAL AND PHYSICAL CHARACTERISTICS:

3.1. General. The finished lubricating oil furnished under these specifications shall be tested by and at the Contractor's expense and shall meet the test values listed in TABLE 1 at the point of delivery. The oil shall also meet the requirements of paragraphs DEGRADATION and HOMOGENEITY. The Government will take samples at the point of delivery and will perform such tests as are deemed necessary to determine whether the oil meets the specifications. Oil failing to meet the requirements shall be replaced by and at the expense of the Contractor.

3.2. Degradation. The quality of the oil shall not be appreciably degraded (changed) by filtration through mechanical type filters, by centrifugal purification or by vacuum type purifier, all of which have been designed for lubricating oil.

3.3. Homogeneity. Additive agents shall remain uniformly distributed throughout the oil at all temperatures above the pour point and up to 120 degrees C (250 degrees F). When the oil is cooled below the pour point, it shall gain homogeneity on standing at temperatures of 5 degrees C (10 degrees F) above the pour point.

3.4. Sampling And Testing.

3.4.1. Sampling - Samples for testing shall be obtained as specified in ASTM D 4057 or ASTM D 4177 and in accordance with paragraph CHEMICAL AND PHYSICAL CHARACTERISTICS.

3.4.2. Testing: Chemical and physical tests shall be conducted in accordance with the ASTM Standards listed in TABLE A. Certified copies of all tests shall be furnished to the Government (see address Para 1.2) prior to delivery of the oil.

3.4.3. Government Testing: Prior to unloading the oil at the Project, the Government has the option of sampling and testing each shipment of the oil to determine if it meets the requirements of these specifications. The Government shall be allowed two days to complete sampling and testing of each shipment at no additional cost to the Government. If a shipment of oil fails this testing, the Contractor shall remove that shipment of oil and replace it within three calendar days at no additional cost to the Government. The replacement shipment will again be sampled and tested to determine if it meets the requirements of these specifications.

4. METHOD OF DELIVERY:

4.1. 24,000 gallons of the oil shall be delivered to the Project in bulk by tractor trailer with a load of 6,000 gallon per trailer. Unloading the trailer will be accomplished by the Government and will take approximately four working days per trailer. The Contractor has the option of delivering the oil one trailer at a time providing there is no more than one calendar day between the time a trailer is empty and the time the next full trailer arrives on site. See schedule below.

16 September 1998: First full trailer on site ready for unloading

28 September 1998: Second full trailer on site ready for unloading

5 October 1998: Third full trailer on site ready for unloading

13 October 1998: Forth full trailer on site ready for unloading

Note: At the Contractor's option, the tractor and driver do not have to remain with the trailer provided that the Contractor will allow the Government to move the trailer with a Government tractor to facilitate the unloading process.

Note: Some adjustment in the schedule after the first trailer is delivered may be necessary: plus one or two days per trailer. Contractor shall coordinate schedule with point of contact at the Fort Randall Project.

4.2. 2,750 gallons of the oil shall be delivered to the Project in 55 gallon barrels on or before 18 September 1998. The barrels shall become the property of the Government.

5. METHOD OF DESPOSAL OF THE INSERVICE OIL: The Contractor shall provide an empty tractor trailer with a minimum capacity of 6,500 gal for disposal of the in-service turbine lube oil. Loading the trailer will be accomplished by the Government and will take approximately four working days per trailer. The Contractor has the option of delivering one empty trailer at a time providing there is no more than one calendar day between the time the trailer is full and the time the next empty trailer arrives on site. At the Contractor's option, the first full trailer that is delivered to the site can be used as the second empty trailer for disposal of the in-service oil, the second full trailer as the third empty, and so on. Approximately 26,500 gallons of in-service oil will become the property of the Contractor and shall be disposed of by the Contractor. See schedule below:

14 September 1998: First empty trailer on site ready for loading

23 September 1998: Second empty trailer on site ready for loading

30 September 1998: Third empty trailer on site ready for loading

7 October 1998: Forth empty trailer on site ready for loading

14 October 1998: If necessary, fifth empty trailer on site

Note: At the Contractor's option, the tractor and driver do not have to remain with the trailer provided that the Contractor will allow the Government to move the trailer with a Government tractor to facilitate the loading process.

Note: Some adjustment in the schedule after the first trailer is delivered may be necessary: plus one or two days per trailer. Contractor shall coordinate schedule with point of contact at the Fort Randall Project.

6. ADDRESS OF PROJECT: The oil shall be delivered by the Contractor to the U S Army Corps of Engineers hydroelectric Powerhouse at the Fort Randall Project, located near Pickstown, South Dakota. In service oil is located at the same site. The point of contact at the Project is Mr. Ron Gall, (605) 487-7845 ext 3004.

## CHEMICAL AND PHYSICAL REQUIREMENTS AND TEST METHODS — TABLE A

| CHARACTERISTICS | REQUIREMENTS FOR ISO 68 | ASTM TEST METHOD |
|---|---|---|
| Gravity, API, 15.56 degrees C (60 degrees F) | Report | D 287 |
| Viscosity | | D 445 |
| SUS at 37.78 degrees C (100 degrees F) | Report | |
| SUS at 98.89 degrees C (210 degrees F) | Report | |
| Centistokes at 40 degrees C (104 degrees F) | 61.2 - 74.8 | |
| Centistokes at 100 degrees C (212 degrees F) | Report | |
| Viscosity Index, minimum | 90 | D 2270 |
| Pour Point, maximum degrees C (degrees F) | -7 (20) | D 97 |
| Flash Point, minimum degrees C (degrees F) | 204 (400) | D 92 |
| Color | Report | D 1500 |
| Neutralization No., maximum reported as total acid No. (TAN) | 0.2 | D 974 |
| Oxidation test; time required in hours to reach neutralization value of 2.0 mg KOH, minimum | 1,000* | D 943 |
| Rotating Bomb Oxidation test (RBOT), Minutes minimum | 200 | D 2272 |
| Rust-prevention test, Procedure A&B 24 hr | Pass | D 665 |
| Water | No free Water** | D 95 |
| Emulsion test, minutes for complete Separation, maximum | 30*** | D 1401 |

OTCo 52 50 -20%

| | | |
|---|---|---|
| Foaming Characteristics | | C TC: D 892 —Quart #200.00 — 20% |
| After 5 minute blowing period: | | |
| Sequence 1, foam volume, ml max. | 150 | |
| Sequence 2, foam volume, ml max. | 50 | |
| Sequence 3, foam volume, ml max. | 150 | |
| After 10 minute settling period | | |
| Sequence 1, foam volume, ml max. | 50 | |
| Sequence 2, foam volume, ml max. | 10 | |
| Sequence 3, foam volume, ml max. | 50 | |
| Corrosion, copper-strip, 3 hours at 100 degrees C | Pass 1 | D 130 |

*At the conclusion of the 1,000 hour test, in addition to determining the neutralization value, the oil and water phases shall be examined for evidence of sludge and catalyst metal corrosion. **NOTE: Due to the length of time required to perform this test, the Government will accept certified test data showing that this test has been previously completed (and all the requirements met) using oil of the same manufacture, composition, and designation, as that furnished under this contract.**

**Oil must be clear and bright.

***A 3 ml emulsion cuff is acceptable.

3.4.2. Testing: Chemical and physical tests shall be conducted in accordance with the ASTM Standards listed in TABLE A. Certified copies of all tests shall be furnished to the Government (see address Para 1.2) prior to delivery of the oil.

3.4.3. Government Testing: Prior to unloading the oil at the Project, the Government has the option of sampling and testing each shipment of the oil to determine if it meets the requirements of these specifications. The Government shall be allowed two days to complete sampling and testing of each shipment at no additional cost to the Government. If a shipment of oil fails this testing, the Contractor shall remove that shipment of oil and replace it within three calendar days at no additional cost to the Government. The replacement shipment will again be sampled and tested to determine if it meets the requirements of these specifications.

4. METHOD OF DELIVERY:

4.1. 24,000 gallons of the oil shall be delivered to the Project in bulk by tractor trailer with a load of 6,000 gallon per trailer. Unloading the trailer will be accomplished by the Government and will take approximately four working days per trailer. The Contractor has the option of delivering the oil one trailer at a time providing there is no more than one calendar day between the time a trailer is empty and the time the next full trailer arrives on site. See schedule below.

16 September 1998: First full trailer on site ready for unloading

28 September 1998: Second full trailer on site ready for unloading

5 October 1998: Third full trailer on site ready for unloading

13 October 1998: Forth full trailer on site ready for unloading

Note: At the Contractor's option, the tractor and driver do not have to remain with the trailer provided that the Contractor will allow the Government to move the trailer with a Government tractor to facilitate the unloading process.

Note: Some adjustment in the schedule after the first trailer is delivered may be necessary: plus one or two days per trailer. Contractor shall coordinate schedule with point of contact at the Fort Randall Project.

4.2. 2,750 gallons of the oil shall be delivered to the Project in 55 gallon barrels on or before 18 September 1998. The barrels shall become the property of the Government.

5. METHOD OF DESPOSAL OF THE INSERVICE OIL: The Contractor shall provide an empty tractor trailer with a minimum capacity of 6,500 gal for disposal of the in-service turbine lube oil. Loading the trailer will be accomplished by the Government and will take approximately four working days per trailer. The Contractor has the option of delivering one empty trailer at a time providing there is no more than one calendar day between the time the trailer is full and the time the next empty trailer arrives on site. At the Contractor's option, the first full trailer that is delivered to the site can be used as the second empty trailer for disposal of the in-service oil, the second full trailer as the third empty, and so on. Approximately 26,500 gallons of in-service oil will become the property of the Contractor and shall be disposed of by the Contractor. See schedule below:

14 September 1998: First empty trailer on site ready for loading

23 September 1998: Second empty trailer on site ready for loading

30 September 1998: Third empty trailer on site ready for loading

7 October 1998: Forth empty trailer on site ready for loading

14 October 1998: If necessary, fifth empty trailer on site

Note: At the Contractor's option, the tractor and driver do not have to remain with the trailer provided that the Contractor will allow the Government to move the trailer with a Government tractor to facilitate the loading process.

Note: Some adjustment in the schedule after the first trailer is delivered may be necessary: plus one or two days per trailer. Contractor shall coordinate schedule with point of contact at the Fort Randall Project.

6. ADDRESS OF PROJECT: The oil shall be delivered by the Contractor to the U S Army Corps of Engineers hydroelectric Powerhouse at the Fort Randall Project, located near Pickstown, South Dakota. In service oil is located at the same site. The point of contact at the Project is Mr. Ron Gall, (605) 487-7845 ext 3004.

DEPARTMENT OF THE ARMY
CORPS OF ENGINEERS, OMAHA DISTRICT
106 SOUTH 15TH STREET
OMAHA, NEBRASKA 68102-1618

REPLY TO:

November 18, 2002

NOV .. 2002

Office of Counsel

CERTIFIED MAIL
RETURN RECEIPT
REQUESTED

Allied Oil & Supply, Inc.
2209 South 24th Street
Omaha, Nebraska 68108

Gentlemen:

By a letter dated March 1, 2000, the United States Army Corps of Engineers, Omaha District, informed you that it would furnish, when known, the actual monetary damages caused by turbine lubricating oil supplied by Allied Oil & Supply, Inc., under Contract No. DACW45-98-P-0564 for use at the Fort Randall Project, Pickstown, South Dakota. I have set forth below my findings of fact and rationale in support of Government entitlement to $658,406.95 for the damages caused by Allied Oil & Supply, Inc., in supplying a turbine lubricating oil that (1) failed to comply with the Contract specifications regarding emulsion (oil-water separation), and (2) contained an antifoaming additive that failed to remain in solution and formed a gel within the turbine generating units and governors.

## FINDINGS OF FACT

1. Contract No. DACW45-98-P-0564, "Purchase Turbine Lubricating Oil," Fort Randall Project, Pickstown, South Dakota, was awarded to Allied Oil & Supply, Inc. (hereinafter "Allied"), by the U.S. Army Corps of Engineers, Omaha District (hereinafter the "Government"), following simplified acquisition procedures. The recited consideration was $47,460.00. The Contract required the delivery of 26,750 gallons of high-grade lubricating oil for use in hydraulic turbine and generator bearings and hydraulic turbine governors at the Fort Randall Project. The oil had to meet the specified physical and chemical characteristics, including the specified anti-corrosion, anti-oxidation, and antifoaming properties. Of the 26,750 gallons to be delivered, Allied was to provide 2,750 gallons in 55-gallon barrels by September 18, 1998. The contract also required the removal and disposal of the approximately 26,500 gallons of oil that was then in service at Fort Randall Project.

2. Pertinent contract clauses and specifications include:

a. Technical Provisions, Turbine Lubricating Oil, Paragraph 2, Type of Oil;

EXHIBIT "3"

b. Technical Provisions, Turbine Lubricating Oil, Paragraph 3.1, Chemical and Physical Characteristics: General;

c. Technical Provisions, Turbine Lubricating Oil, Paragraph 3.3, Chemical and Physical Characteristics: Homogeneity;

d. Technical Provisions, Turbine Lubricating Oil, Paragraph 3.4.3, Chemical and Physical Characteristics: Government Testing;

e. Technical Provisions, Table A, Chemical and Physical Requirements and Test Methods.

3. Allied hired Warren Performance Packaging (hereinafter "Warren") to produce the final product to be supplied to the Government, through blending an additive package into base turbine lubricating oil. Warren and Allied decided to use turbine lubricating oil that had been refined through a new "hydrocracking" process and an additive package that included a silicone-based antifoaming additive supplied by Lubrizol and produced by Dow Chemical.

4. Allied made its first delivery of 5,990 gallons of this blended turbine oil (hereinafter referred to as "new oil") on September 16, 1998. During the next two weeks, Allied delivered an additional 8,638 gallons of the new oil, including 2,695 gallons in the 55-gallon barrels, and it removed approximately 12,000 gallons of used turbine oil.

5. On October 1, 1998, Allied delivered 6,004 gallons of new turbine oil. On this date, Government personnel first observed that the new oil being supplied by Allied was beginning to cloud up with a white substance. After having taken some samples of the oil, Government personnel noted that when a sample sat undisturbed in a clear container, a cloud formed near the bottom of the container. The cloud disappeared when the sample was shaken. The Government promptly notified Allied about this problem.

6. On October 6, 1998, representatives from the Government, Allied, and Warren met to discuss the "cloudiness" problem with the new oil being supplied by Allied. The Government provided additional oil samples to Allied and Warren for laboratory testing. Despite the continued "cloudiness" problem, Allied continued replacing the old oil in the generating units, supplying 5,033 gallons on October 6, 1998, and 1,500 gallons on November 2, 1998.

7. In November 1998, as a representative of Allied, Chuck Kilstrom informed the Government that the white substance found in the new oil was the antifoaming additive that was settling out of the solution for an unknown reason when the oil sat undisturbed. Allied expressed its belief that the problem would be resolved when the new oil actually was in service and no damage should result. Still, after Allied could not find a way to get the antifoaming additive to be absorbed back into the new oil, Allied received additional samples from the Government in order to run further laboratory tests to see whether the oil met the Contract's requirements.

8. In January 1999, Allied informed the Government that its laboratory test results showed that the new turbine oil met the Contract's requirements. However, Allied still promised the Government that it would find a non-silicone antifoaming additive to put in the oil to ensure that there would be no future problems with foaming. In early February 1999, the Government and Allied agreed that Allied should supply a different antifoaming additive for placement into the new oil that had been installed in the generators and governors of the power plant.

9. On February 22, 1999, the Government shut down Turbine Unit No. 5 in order to perform routine preventative maintenance. On the next day, mechanics from the plant discovered that the filters in the governor system were clogged completely with a grease-like gel material. Subsequently, Government personnel checked the governor filters of several other turbine units, and they found the same gel was clogging those filters. Chuck Kilstrom and Tom Snuttjer, respectively representatives of Allied and Warren, observed this gel in the filters on February 25, 1999, and they took samples for laboratory testing.

10. On March 10, 1999, representatives from the Government, Allied, and Warren discussed the serious problems with the additive package, including the gel that was clogging the governor filters. Warren admitted at this meeting that its testing of the gel showed that it resulted from the silicone-based antifoaming agent settling out of the new oil. Warren theorized that some original oil remained in the turbine units after the Government drained them, and the antifoaming agent reacted with some small amounts of contaminants in the old oil (such as water, sand, zinc, sulfur, calcium, phosphorus, and cloth fibers) to form the grease-like gel. However, the Government and Allied agreed that the gel also had formed on the bottom of 55-gallon barrels containing new oil that was never installed in any units, as well as within containers storing samples taken of the new oil for testing. Warren also advised the Government that it no longer used this additive package with the new Group II hydrocracked base stocks, as the industry had discovered there was a problem with solubility when blended with additives.

11. Based on these facts, in a letter dated March 24, 1999, Allied proposed that it replace the new oil with solvent-refined Group I turbine oil, in hopes that the solvents in the replacement oil would remove the silicone residue left in the turbine units after draining the new oil from them. Allied also proposed that it filter this Group I oil at the Fort Randall Project before it is installed. In a letter dated April 5, 1999, the Government agreed to Allied's proposal, but the Government also suggested that Allied flush the power plant's distribution lines with additional oil, as this would lessen the chances that the replacement oil would get contaminated by the new oil. Allied agreed that all of this work would be done at no cost to the Government.

12. During March and April 1999, Allied attempted first to get the antifoaming additive to absorb back into the new oil. Later, Allied tried to filter the antifoaming additive out of the oil in the units.

13. On April 19, 1999, the Government took Turbine Unit No. 3 out of service for routine maintenance work and for replacement of the thrust bearing oil coolers. In examining the interior

of the unit, Fort Randall Project personnel found nearly all of the machinery surfaces of the thrust bearing housing to be covered completely with a gel substance, which measured over a quarter-inch thick in some areas. Since their installation at the Fort Randall Project, the Government had generally inspected each of the turbine units every other year, while performing routine preventative maintenance, and it never found any prior evidence of a foreign substance accumulating in any of the units.

14. Representatives of Allied inspected Turbine Unit No. 3 on May 1, 1999, and took samples of the gel found in the unit. The extent of the gel formation indicated that Allied would have to do more than drain the new oil out of the units and provide replacement oil in order to fully address the problem. During late April and early May 1999, Allied proposed to the Government that Allied furnish a filter to be attached to the turbine units' oil reservoirs. Allied would circulate oil through the units at a ratio of 45 gallons per minute in order to flush and filter the gel out of the units, in hopes of avoiding the need to disassemble each unit for manual cleaning. From April 29, 1999, through June 10, 1999, Allied delivered 11,172 gallons of turbine lubricating oil (hereinafter referred to as "replacement oil") to the Fort Randall Project. This replacement oil was an equal mixture of the previously utilized Group II hydrocracked oil and Group I solvent-refined oil.

15. On May 25, 1999, the Government sent a letter to Allied that allowed it to proceed with its proposed attempt to filter the gel out of the turbine oil, and the Government also promised to provide any assistance that Allied may have needed. However, the Government also advised Allied that it would proceed with the process of dismantling and manually cleaning each turbine unit in succession if the filtering process did not succeed in removing the gel, and the Government would seek recovery of those cleaning costs from Allied.

16. On June 1, 1999, during a visit to the Fort Randall power plant, Conrad Heinson, Gary Christian, and Tom Snuttjer informed the Government that Allied and Warren no longer were going to try to filter the additive and gel out of the oil. Rather, they were going to attempt to flush the defective new oil and gel out of the units. Allied also agreed to replace the oil and oil filters in the governors, which was accomplished during the period of June 14-23, 1999.

17. On June 11, 1999, the Government decided to test some samples taken of the replacement oil in Turbine Unit No. 3, in order to verify that it complied with the contract and would not cause any new problems.

18. On June 19, 1999, a power plant mechanic noticed sediment floating in the samples of the replacement oil that had been installed in Turbine Unit No. 3 and all of the governor systems. Warren and the Government each took samples of the oil and sediment for analysis and testing. On August 4, 1999, the Government had the results of its laboratory testing of the replacement oil installed into Turbine Unit No. 3 and the governors. While the Government was unable to determine what the sediment was, it did determine that the replacement oil did not meet the emulsion requirements of the Contract.

19. On August 10, 1999, power plant mechanics checked the oil filters in the governors, and they found a new substance clogging these filters. It was clearer and less viscous than the gel previously found in Turbine Unit No. 3 and the governors.

20. On August 18, 1999, the Government took additional samples of the replacement oil from Turbine Unit No. 3 and the governors, and it sent the samples for laboratory testing on August 19, 1999, in order to verify that the replacement oil did not comply with the Contract's requirements. When the Government received the laboratory test results on September 23, 1999, the replacement oil again failed to meet the emulsion requirements of the Contract.

21. On September 24, 1999, Allied and the Government met to discuss the problems with the replacement oil. Allied informed the Government that it would have to check with Warren regarding the reasons why the replacement oil was having the same problem with the additive package settling out of the oil and forming a gel. Allied then proposed that it would replace all of the new oil and replacement oil that it had supplied to the Government under the Contract with Group I oil (hereinafter referred to as "second replacement oil"), and the Government accepted this proposal to again replace non-complaint oil, at no cost to the Government.

22. The Government took Turbine Unit No. 8 out of service on September 27, 1999, in order to perform annual maintenance and to replace the thrust bearing cooling coils. On October 4, 1999, Allied and Warren began their attempt at a process to flush the gel out of the unit. The flushing process lasted over twenty-four (24) hours and included a spray of mineral spirit solvent and Stoddard solvent followed by a neutral oil flush. After the process was finished and while the personnel from Allied and Warren still were present, power plant personnel began to dismantle the bearing housing of Turbine Unit No. 8. After the lower bearing cover and bearing itself were removed, it was evident that the flushing process failed as Unit No. 8's interior essentially still was covered with the gel, except that the solvent spray did remove the gel from the few small areas where it was directly applied. Warren and Allied recognized that there was not sufficient access into the bearing housing in order for the flushing process to work.

23. On October 29, 1999, Allied delivered 6,500 gallons of second replacement oil to flush out the powerhouse oil lines and refill the bearings and governor systems for both Turbine Unit No. 3 and Turbine Unit No. 8. Prior to the shipment leaving Omaha, Nebraska, for the Fort Randall Project, the Government took a sample of the second replacement oil and sent it to Omaha for laboratory testing to verify contract compliance. After the sample passed the tests, the oil shipment was allowed to proceed. Allied drained the second replacement oil from its delivery truck into the plant lube oil system, and the Government took samples from Tanks #1 and #4 as the oil left the truck. The Government did not undertake laboratory testing of these samples until December 9, 1999, with the results being that the samples failed the emulsion test. Allied then was notified of these failures. At a meeting on January 25, 2000, on behalf of Allied, Conrad Heinson informed the Government that the tanks previously had been filled with diesel engine oil, which may have caused the failures. Allied (Heinson) promised to flush out the tanks and discharge lines with all future oil deliveries of the second replacement oil.

24. Allied had taken its own samples from each tank prior to delivering the oil, and Warren similarly had taken samples from their main storage tank. Both Allied and Warren furnished these samples to the Government for laboratory testing. While Allied already had installed some of this second replacement oil in the bearings and governor system of Turbine Unit No. 8, most of it remained in the clean oil tank of the power plant. Therefore, the Government took its own samples from these locations. After the laboratory testing was completed, only the sample from Allied failed to pass the oil-water separation tests. The Government then retook samples from the power plant on January 18, 2000, and January 20, 2000, and these samples also passed the laboratory tests. As a result, the Government accepted the second replacement oil that Allied supplied on October 28, 1999.

25. On January 25, 2000, representatives of Allied and the Government met to discuss the ongoing problem of the gel in the turbine units and governors, as well as the difficulty that Allied had in supplying turbine oil that satisfied the Contract's emulsion requirement. At the time of the meeting, Turbine Units No. 3 and No. 8 were the only units that had the gel already removed from them by Government personnel. Unit No. 3 and all of the governor systems contained replacement oil that failed to meet the emulsion requirement of the Contract, while Unit No. 8 did contain the contractually compliant second replacement oil. All of the remaining turbine units had to have the gel removed and be cleaned by the Government before Allied could replace its non-compliant oil with the second replacement oil.

26. At this meeting, the Government provided Allied with a projected schedule of when work would be done on the turbine units. With the exception of Unit No. 3 and Unit No. 8, the other six units were scheduled to be individually: (1) taken down, (2) have its thrust bearings removed, (3) drained, (4) thoroughly hand cleaned and wiped down, (5) reassembled, and (6) placed back on-line. The Government proposed doing this work with its own power plant personnel, based on their expertise and experience with the turbine units. The Government also explained to Allied that the proposed schedule was developed so as to minimize the amount of time that units would be down during the peak periods for electricity production, thereby mitigating the damages suffered from the loss of power production revenue. The Government scheduled the work around a liberal outage schedule provided by the Missouri River Reservoir Control Center.

27. On February 4, 2000, Allied delivered second replacement oil to the Fort Randall Project for use in Turbine Unit No. 3. The Government took samples of the oil and drove them to Omaha for laboratory testing. As had previously occurred, the second replacement oil failed the emulsion test. In order to confirm these results, the Government then took samples directly from Allied's truck, and these samples similarly failed. The Government then took Unit No. 3 out of service and inspected it. It determined that the oil remaining from the October 28, 1999, shipment, could replace the oil in the governor system.

28. The Government took Turbine Unit No. 2 out of service on February 14, 2000. Allied shipped 5,000 gallons of the second replacement oil on February 25, 2000. The Government

took samples of the oil during the various stages of loading and delivery. Every sample passed the Government's laboratory tests. After the Government completed the gel removal and cleaning process, it placed Unit No. 2 back into service on March 9, 2000.

29. The Government took Turbine Unit No. 7 out of service on March 20, 2000, and Allied delivered 3,500 gallons of the second replacement oil on March 22, 2000. The Government took samples of the oil both before and after the delivery, and each sample passed the Government's laboratory tests. After the Government completed the gel removal and cleaning process, it placed Unit No. 7 back into service on April 14, 2000.

30. On April 24, 2000, the Government took Turbine Unit No. 4 out of service, after Allied already had shipped 4,009 gallons of the second replacement oil on April 14, 2000. The Government took samples of the oil at various stages of the delivery, and the oil shipment passed the Government's laboratory tests. After the Government completed the gel removal and cleaning process, as well as replaced the thrust bearing coils, it placed Unit No. 4 back into service on May 24, 2000.

31. The Government again took Unit No. 3 out of service on May 30, 2000, in order to replace the defective oil in the generator bearings. There was sufficient contractually compliant oil from the previous delivery to accomplish this task, and the unit was returned to service on June 1, 2000.

32. The Government took Turbine Unit No. 6 out of service on August 14, 2000. Allied delivered 3,500 gallons of second replacement oil on August 16, 2000. The Government had samples of the oil taken from the truck both in Omaha, before delivery, and at the power plant. The oil in compartment #5 of the truck failed the emulsion test and had a high water content. Some of the oil from compartment #5 had mixed with oil from compartment #1 when it was drained from the truck at the power plant. The Government decided to run the oil through the plant's oil purification unit in an attempt to remove the water. Subsequently, the oil from compartment #5 passed the laboratory tests, and the Government accepted the shipment. After the Government completed the gel removal and cleaning process, it placed Unit No. 6 back into service on September 23, 2000.

33. The Government took Turbine Unit No. 1 out of service on October 10, 2000. Because of the previous history of Allied's oil shipments not meeting the Contract's requirements, Ron Gall traveled to Omaha from the Fort Randall Project in order to observe and take oil samples during the different stages of the filling and delivery process. These second replacement oil samples passed every test, and Allied delivered 3,500 gallons on October 13, 2000. After the Government completed the gel removal and cleaning process, it placed Unit No. 1 back into service on November 15, 2000.

34. The Government took Turbine Unit No. 5 out of service on February 20, 2001. Allied previously had delivered 6,100 gallons of second replacement oil on February 14, 2001. Prior to

shipment, the Government tested samples from the three-truck compartments that contained the oil. Because the samples barely met the emulsion requirements, the Government allowed Allied to send the truck on to the Fort Randall Project. At Fort Randall, the Government took additional samples from the truck's compartments for testing. Only two of the three compartments still met the emulsion requirements.

35. The Government proceeded to take two more samples of the non-complaint oil from the truck compartment, one sample from the top of the compartment and the other sample from the bottom. The bottom sample failed the emulsion test. After it had further testing done by a laboratory in Texas, the Government decided to run the non-complaint oil from that one compartment through the plant's oil purification unit. To ensure that this oil did not mix with any other oil in the plant, Allied placed the non-compliant oil in dry, clean plastic containers on March 28, 2001. The Government then ran this oil through the purification unit on April 6, 2001. After the "purification" process was completed, the Government then took samples of the oil and sent them to Omaha for testing on April 10, 2001, with the test results being marginal compliance with the emulsion requirements.

36. On May 31, 2001, the Government ran the oil through the purification unit a second time. Although the samples taken after this second "purification" still only marginally passed the emulsion test, the Government decided to accept the shipment as having passed the laboratory tests. As the Government had completed the gel removal and cleaning process on March 29, 2001, Unit No. 5 was available for service upon acceptance of the oil.

37. The Government established a separate cost code at the Fort Randall Project in order to track the costs and hours involved with the gel removal process, while routine maintenance work continued to be done under the existing cost code. The Government has determined that it incurred $305,762.67 in labor expenses because of the gel found in the turbine units. Fort Randall personnel worked a total of 5,526 hours, including 2,354 hours of overtime, in cleaning the gel out of Turbine Units Nos. 1, 2, 5, 6, and 7, including the disassembly, the actual cleaning, and the reassembly of each unit.

38. The Government has not included any hours or costs for any work that was routine maintenance and previously scheduled to be done before the gel was discovered in the machines. For this reason, the Government did not include the costs it incurred on Turbine Unit No. 4, because it previously had scheduled to take the unit out of service for replacement of the thrust bearing cooling coils. Similarly, the Government has not claimed the expenses related to Turbine Units Nos. 3 and 8, as they were cleaned while Fort Randall personnel performed other required maintenance work.

39. As was provided in greater detail in previous paragraphs, after Allied had supplied the non-compliant hydrocracked Group II oil for use at the Fort Randall Project, the Government took samples from every oil delivery made by Allied during the period of June 11, 1999, to February 20, 2001. The Government then performed laboratory tests on these samples to make

sure that the oil being delivered by Allied actually met the Contract's requirements, particularly with regard to oil-water emulsion, incurring $18,001.08 in laboratory testing costs and other related expenses.

40. The Fort Randall Project utilizes its eight turbine units in generating electrical power that then is sold by the Western Area Power Authority (WAPA) for consumer use. Each turbine unit produces forty megawatts per hour (40 mWh). There is a peak production period of sixteen hours and an off-peak production period of eight hours each day. Depending on the demand for electricity at the time, there is a possibility for a loss in revenue when one of the turbine units becomes unavailable for use, especially during the peak production period.

41. The Government performed the cleaning process on the turbine units so that all but one of the outages were during periods when less electrical power production was needed. However, the Government had to take down Unit No. 6 for cleaning during the period of August 14, 2000, to September 23, 2000. In support of a pending Congressional appropriation, the Hydrologic Design Center for the Corps of Engineers scheduled turbine efficiency testing for the first weekend in October 2000, when the reservoir level would be at the necessary elevation for the tests. Because the testing required frequent stopping and starting of the Unit No. 6 generator, it was critical that the gel was removed from the thrust bearing prior to the tests. Otherwise, the gel could have clogged the thrust bearing high pressure oil lift filters, causing damage to the generator thrust bearings and resulting in additional Governmental damages.

42. While Unit No. 6 was offline in order to remove the additive-caused sludge from the unit, the Fort Randall Power Plant generated 40 less megawatts per hour during the sixteen hours of the peak production period. To make up for the lesser amount of peak power production, the Fort Randall Project had to have the remaining units generate at a higher rate than normal during the off-peak hours in order to compensate for the loss of the 640 megawatts that Generating Unit No. 6 would have produced if it had been on-line.

43. Although the Government actually took Generating Unit No. 6 offline on August 14, 2000, the Government calculated its damages starting on August 17, 2000, because there were peaking restrictions placed on the Fort Randall Power Plant based on concerns with endangered species, and the restrictions were removed on August 16. In addition, the Government is excluding Sundays and holidays from the calculations of power production. During the period from August 17, 2000, to September 23, 2000, the average daily sale price for on-peak power from WAPA's East Division (of which Fort Randall is a part) was $35.39 per megawatt hour (mWh), while the off-peak sale price during that same period was only $19.05 per mWh. Based on a difference of $16.34 per megawatt hour, the Government lost $334,643.20 in revenue when it had to generate the 640 mWh during non-peak hours instead of during peak hours from August 17 to September 23.

44. By a letter dated September 13, 2001, the Government provided a draft set of Findings of Fact to Allied, along with a proposed Determination, and it invited Allied to submit additional information, documentation, and reasons supporting its contentions that the Government's claim is

not meritorious. In the 14 months since that letter was sent, Allied has requested further discussions with the Government and received supporting documentation from the Government. However, Allied has not provided any factual documentation or substantiated rationale to refute the validity of the Government's claim.

45. The contract contains the standard "Changes" clause for supply contracts awarded after the enactment of the Contract Disputes Act of 1978.

## DETERMINATION AND REASONS THEREFORE

I find that Allied Oil & Supply, Inc., is responsible for the costs incurred by the Government for the following reasons:

46. Allied supplied new turbine lubricating oil and replacement oil that each failed to meet the emulsion requirements of the Contract, as shown through laboratory testing of the oil samples. Because of these failures, the Government invoked its right pursuant to Paragraph 3.4.3 of the Contract's Technical Provisions for the turbine lubricating oil, to sample and test every shipment of replacement and second replacement oil, in order to verify that first the replacement oil and then the second replacement oil did continuously meet the Contract's specifications. In invoking this contractual right, the Government incurred $18,001.08 in total expenses related to performing the laboratory testing of the replacement oil samples and second replacement oil samples. Yet, Paragraph 3.4.3 requires that the samples and testing be done at no cost to the Government.

47. While Allied has agreed that the Government was not responsible for the gel, and hence should not bear the costs related to its removal, it apparently wants to avoid liability by blaming Warren and its lower tier vendors who provided the silicone antifoaming additive and blended the oil. However, "insofar as [it] seeks to isolate itself from responsibility for the failures attributable to the actions of the subcontractor, such attempts are futile." Appeal of Luster-On Products, Inc., 80-2 BCA ¶14,777, ASBCA No. 23,367 (October 28, 1980).

48. The Armed Services Board of Contract Appeals consistently has held that a prime contractor is totally responsible for the actions of its subcontractors and suppliers. See Id.; Appeal of Browne, Inc., 80-2 BCA 14,471, ASBCA 24,434 (May 12, 1980). See also P.J. Dick, Inc. v. General Services Administration, 94-3 BCA 27,073, GSBCA No. 12,036 (July 20, 1994). Because the Government's contract is with Allied, and not Warren, Lubrizol, or Dow Chemical, it was the party responsible for ensuring that the turbine oil that it supplied to the Government actually met all of the Contract's requirements, and it cannot relieve itself of this responsibility through subcontracting the underlying work. Luster-On Products, 80-2 BCA ¶14,777, ASBCA No. 23,367 (October 28, 1980). Allied is as liable to the Government for the poor performance of its subcontractors and the damages that resulted as it would be if Allied itself had produced the additive package and blended the oil.

49. On its behalf, Warren repeatedly has stated that the antifoaming additive was not the only contributing component of the gel-like substances found in the turbine units, alleging that the gel formed when the antifoaming additive settled out of the blended oil and then mixed with other materials found in the original oil that must have remained in the turbine units. However, this theory is not supported by either Allied or the undisputed facts on this matter. Firstly, the laboratory testing done by Allied and its subcontractors demonstrate that the largest component of the gel was silicone, undeniably from the silicone-based antifoaming additive. Then, during the meeting on January 25, 2000, Allied's Vice President of Operations, A. J. Mudd, stated that he understood the facts to be that the small amounts of sand, ragweed, and cotton fibers found in the gel were not the cause of the antifoaming additive separating from the turbine oil or the gel accumulating in the turbine units.

50. Most significantly, Allied repeatedly admitted at the meeting held on January 25, 2000, as well as at several other meetings of the parties, that the same gel also formed at the bottom of unused 55-gallon barrels of turbine oil that it had supplied under the Contract. It is an incontrovertible fact the oil in the barrels had not been placed in the turbine units and hence never came in contact with either the turbine units or any original oil that remained in the units. Thus, it is clear that the gel formed even without any existing "contaminants" from the old oil, thereby disproving Warren's arguments for partial Governmental liability. It would appear that the gel incorporated the insignificant amounts of these other "contaminants" either during its formation or after its formation in the turbine units.

51. Most importantly, regardless of how other materials became part of the gel that formed in the turbine units, Allied has admitted that the gel would not have formed and accumulated in the turbine units if the antifoaming additive had not separated out of the blended turbine oil. At the meeting on January 25, 2000, Allied's President, Conrad Heinson, acknowledged the fact that the Government had been mixing oil in the turbine units at Fort Randall for over forty years, and it never had a problem with any gel or other substance accumulation until it put the oil supplied by Allied into the units. Similar to the admissions made by Allied and Warren personnel at the meeting on March 10, 1999, Heinson also informed the Government that Allied discovered after supplying the original hydrocracked Group II turbine oil to the Government that such oil was found by the industry to be unsuitable for blending. Heinson explained that Group II oil is so clean and pure that it resists mixing with certain additive packages, effectively treating the additives as contaminants.

52. Finally, it is clear that Allied foresaw and was aware of the potential damage that could occur to the turbine units when the antifoaming additive was separating from the blended oil that Warren provided to it. In a letter to Warren, dated February 5, 1999, Allied demonstrated its concern by asking, "Is there any potential for the additive that we see dropping out of solution to form any type of sludge that could plug or adversely affect equipment performance with tolerances measured in thousands [sic] of inches." (emphasis added) This is a significant question because the Government had not yet discovered the evidence of gel in the turbine unit filters at the time of this letter. Yet, both Allied and Warren were fully aware of the potential of the

settled-out antifoaming additive to form a gel that could damage the turbine units if it was not removed.

53. Even the representatives of Allied have admitted on several occasions that the facts allow for only one conclusion: the turbine units at the Fort Randall Project would have remained gel-free *but for* the silicone-based antifoaming additive package separating out from the turbine oil supplied by Allied. Furthermore, if the oil supplied by Allied had not formed a gel within Turbine Units Nos. 1, 2, 5, 6, and 7, then the Government would not have incurred the costs of disassembling and cleaning those units or lost three weeks of peak electrical power production from Unit No. 5. For all of the above reasons, the Government's claim for $658,406.95 is deemed to be affirmed as valid.

54. During a previous meeting between the parties, Allied questioned whether the Government (WAPA) could have avoided incurring any loss in power generation revenue by transferring unneeded energy from somewhere else. On the contrary, the Integrated Transmission System for the Mid-Continent Area Power Pool, of which Fort Randall is a part, could not have transferred energy in order to capitalize on higher prices and/or recoup the lost revenue during the period of August 14, 2000, through September 23, 2000. In accordance with its continued good business practices, WAPA maximized all of the available power production capability in order to maximize its sales revenue during that period. Yet, the United States Treasury still received significantly less power production revenue ($334,643.20) because Turbine Generating Unit No. 6 at the Fort Randall Project had to be taken out of service from August 14, 2000, to September 23, 2000, in order to remove the sludge caused by the additive in the oil supplied by Allied. Even though the Fort Randall Project could offset the lost peak power production from Generating Unit No. 6 by having the remaining units generate more power than normal during the off-peak hours, the Government still incurred damages because off-peak power sells for a lower price.

55. You may consider this to be the Government's formal demand for payment of $658,406.95 under the Contract. The Contracting Officer should be considered to be the responsible official with regard to the calculation and collection of the debt. Any amounts not paid within thirty (30) calendar days from the date of this Contracting Officer's Decision will bear interest from the date of this Decision, and the interest rate shall be the rate established by the Secretary of the Treasury, for this period, under Public Law 92-41. You may submit a proposal for deferment of debt collection if immediate payment is not practicable or if the amount is disputed.

## CONCLUSION

This is the final decision of the contracting officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the

date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less (see enclosed Rules of the Armed Services Board of Contract Appeals). In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Phillip E. Holman

Phillip E. Holman
Contracting Officer

Enclosure