IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| ALLIED OIL & SUPPLY, INC., | |
| Plaintiff, | |
| v. | No. 03-2673 C |
| THE UNITED STATES, | Chief Judge Edward J. Damich |
| Defendant. | |
| and | |
| WARREN DISTRIBUTION, INC., | |
| Third-Party Defendant. | |

**BRIEF IN SUPPORT OF MOTION FOR ENLARGEMENT OF FACT DISCOVERY DEADLINE FOR THE PURPOSE OF SERVING A SUBPOENA UPON CHEMOPTIX, LLC**

# TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| I. | INTRODUCTION AND STATEMENT OF THE QUESTION | 5 |
| II. | STATEMENT OF THE CASE | 6 |
| | Micetic Concluded the Problems at Fort Randall and Other Powerhouses Were Similar to the Problems at the Chief Joseph Powerhouse | 6 |
| | The Chemptix Test Results | 8 |
| | The Government Asked Micetic to Compare the Property Damage at Chief Joseph with the Property Damage at Fort Randall | 9 |
| | Warren and the Government Agreed to Resolve The Dispute Regarding Discovery of Other Dam Sites After Mr. Micetic's August 31, 2005 Deposition | 10 |
| III. | ARGUMENT | 13 |
| | A. The Court Has the Discretion to Grant Leave to Allow the Issuance of a Subpoena Beyond the Fact Discovery Deadline | 13 |
| | B. Justice Requires that Warren Be Provided Leave to Subpoena Records from Chemoptix, LLC | 13 |
| | C. The Timing of Warren's Request Is Appropriate Given the Parties' Agreement to Postpone Resolution of This Discovery Dispute Until After Mr. Micetic's August 31, 2005 Deposition | 15 |
| | D. The Documents Which Warren Wishes to Subpoena Are Documents to Be Reviewed and Analyzed by Expert Witnesses | 16 |
| IV. | CONCLUSION | 16 |

| | | PAGE(S) |
|---|---|---|
| EXHIBIT 1: | Excerpts of the Deposition of John S. Micetic, taken August 31, 2005 | 5-9, 13-15 |

| | | |
|---|---|---|
| **EXHIBIT 2:** | **Report:** ***Performance Problems With Group II Hydro-Cracked Turbine Oils In Corps Of Engineers Hydropower Facilities, report dated December 2004 by US Army Corps of Engineers,*** **by Micetic and Beitelman** | **6, 9, 13** |
| **EXHIBIT 3:** | **Defendant's Response To Third-Party Defendant, Warren Distribution, Inc.'s First Set Of Requests For Production Of Documents And Things, dated February 17, 2005** | **10, 15** |
| **EXHIBIT 4:** | **E-mail from Warren Atty. Moynihan to Gov't Atty. Colt, dated May 26, 2005** | **10, 15** |
| **EXHIBIT 5:** | **E-mail from Gov't Atty. Colt to Warren Atty. Moynihan, dated May 31, 2005** | **10, 15** |
| **EXHIBIT 6:** | **E-mail from Gov't Atty. Colt to Warren Atty. Moynihan, dated June 3, 2005** | **10** |
| **EXHIBIT 7:** | **E-mail from Gov't Atty. Colt to Warren Atty. Buescher, dated June 30, 2005** | **10** |
| **EXHIBIT 8:** | **E-mail from Colt to Moynihan, dated July 12, 2005** | **10** |
| **EXHIBIT 9** | **E-mail from Gov't Atty. Colt to Warren Atty. Moynihan dated July 13, 2005; E-mail from Moynihan to Colt dated July 14, 2005; E-mail from Moynihan to Colt and Stryker dated July 15, 2005; E-mail from Colt to Moynihan and Stryker dated July 18, 2005; E-mail from Moynihan to Colt dated July 28, 2005; E-mail from Colt to Moynihan, dated July 28, 2005** | **11** |
| **EXHIBIT 10** | **E-mail from Gov't Atty. Colt to Warren Atty. Moynihan, dated August 2, 2005** | **12** |
| **EXHIBIT 11** | **E-mail from Gov't Atty. Colt to Allied Atty. Stryker and Warren Atty. Moynihan, dated August 11, 2005** | **12** |
| **EXHIBIT 12** | **E-mail from Gov't Atty. Colt to Warren Atty. Moynihan, dated August 15, 2005** | **12** |
| **EXHIBIT 13** | **E-mail from Gov't Atty. Colt to Allied Atty. Stryker, dated August 11, 2005** | **12** |
| **EXHIBIT 14** | **E-mail from Warren Atty. Buescher to Gov't Atty. Colt dated September 27, 2005; E-mail from Colt to Buescher dated September 28, 2005; E-mail from Colt to Buescher dated September 30, 2005.** | **12** |

**TABLE OF AUTHORITIES**


| | PAGE |
|---|---|
| *Rules of the United States Court of Federal Claims* 6 | 13 |
| *Rules of the United States Court of Federal Claims* 12(b)(1) | 14 |

## I. INTRODUCTION AND STATEMENT OF THE QUESTION

This case arises from the Government's allegations that Plaintiff Allied Oil & Supply, Inc. ("Allied") provided defective hydroelectric turbine oil to the United States Corps of Engineers ("Corps") for the hydroelectric turbine units located at Fort Randall, South Dakota. The Corps claims this oil caused property damage to the turbine units, and the Corps further claims this property damage caused the Corps to incur monetary damages for costs related to repairing the turbine units. The Corps alleges this property damage, at least in part, involved a substance that formed inside of the turbine units and adhered to the inside of those units after the 40+ year old turbine oil was removed from the units and replaced with new oil blended by Warren Distribution, Inc. ("Warren") and supplied by Allied to the Corps.

Mr. John Micetic, a Corps of Engineers chemist, conducted a study unrelated to this litigation which addressed problems that occurred at numerous Corps facilities which are strikingly similar to the problems experienced at Fort Randall. Specifically, Micetic co-authored a report which concluded that the problems at the Chief Joseph Powerhouse in the State of Washington involved "the same pattern of events . . . as those described in [the section of his report addressing the problems at] Fort Randall." (Ex. 1; Micetic Dep. 107:6-18). Mr. Micetic also acknowledged that the problems at both Fort Randall and Chief Joseph appeared to be "similar."

Through this Motion, Warren requests that this Court allow Warren leave to serve a single subpoena upon Chemoptix, LLC. This company performed tests on a substance "from a governor in-line filter at the Chief Joe Powerhouse (Ex. 1; Micetic Dep. 136:1-2) in the State of Washington subsequent to the replacement of turbine oil in those turbine units. Warren seeks these documents in order for its expert witness(es) to review whether the chemical make-up of

the substance found in the governor in-line filter at the Chief Joseph Powerhouse was similar or the same as the chemical make-up of the substance found in the turbine units at the Fort Randall Facility.

## II. STATEMENT OF THE CASE

Mr. John Micetic, a Corps of Engineers chemist located in Portland, Oregon, co-authored a report with Mr. Alfred D. Beitelman entitled *Performance Problems with Group II Hydro-Cracked Turbine Oils in Corps of Engineers Hydropower Facilities*. (Ex. 2; Micetic Report). Mr. Micetic's report discussed numerous Corps powerhouses which experienced property damage in the form of the formation of a substance when adding new oil to existing in-service oil to the turbine units or replacing the turbine units' existing in-service oil with new oil. (Ex. 2, Micetic Report, WAG 22). Among the many Corps powerhouses discussed in Mr. Micetic's report was the Chief Joseph Powerhouse in the State of Washington, where old in-service oil was replaced with new oil. (Ex. 2, Micetic Report, WAG 000024).

### Micetic Concluded the Problems at Fort Randall and Other Powerhouses Were Similar to the Problems at the Chief Joseph Powerhouse

On August 31, 2005, Defendant Warren Distribution, Inc. ("Warren") completed a deposition of Corps of Engineers chemist John Micetic. (Ex. 1, p. 1). Mr. Micetic testified that the property damage found in the Chief Joseph Powerhouse was similar to the manifestation of the property damage at Fort Randall:

> Q: After talking to Fort Randall and other facilities, did you conclude that the problems that you were seeing at Chief Joseph appeared to be more widespread than just at Chief Joseph?
>
> A: Correct.
>
> Q: Based on the investigation you did, did it appear that problems were similar to that at Chief Joseph at other places?

A: They were the same or similar, actually, manifestations of the problem.

Q: And those manifestations being what?

A. Being increased air entrainment, foaming, sticking of proportional valves, and plugging of the governor in-line filters.

(Ex. 1; Micetic Dep. 85:24-86:12).

Q: [Let's] [g]o on to talk about Chief Joseph on page 6. At Chief Joseph Powerhouse in Washington, the facility replaced old Group I oil with new Group II oil. Is that right?

A. Correct.

Q. And your report states that "A few months later, the same pattern of events was noticed as those described in Fort Randall." Is that right?

A. Correct.

Q. What pattern of events would that be?

A. It would be foaming of the oil in the governor sump, sticking of the proportional valves, and plugging of in-line filters.

(Ex. 1; Micetic Dep. 107:6-18).

Q: If you look at the first survey question you have here, "have you experienced an unusual increase of foaming or air entrapment after your oil has been replaced?" Would it be correct that five powerhouses answered yes to that?

A: Correct.

* * *

Q: Do you think Fort Randall was one of those?

A: Yes.

Q: Do you think Chief Joseph was one of those?

A: Yes.

(Ex. 1; Micetic Dep. 114:25-115:12).

Q: If you go to the third question on page 10 [of the Micetic report], "have you experienced operational difficulties caused by sticking of governor valves or filter clogging after oil was replaced or makeup oil has been added?" Do you see that?

A: Yes.

Q: Eight entities responded yes. Do you see that?

A: Yes.

Q: . . . Do you happen to know . . . if certain ones you know for sure would have responded yes to that?

A: I would think all of the - - - it would be Fort Randall, it would be Chief Joe, Ozark, pretty much the ones that this report mentions.

(Ex. 1; Micetic Dep. 117: 24-118: 14).

**The Chemptix Test Results**

As a part of his investigation into the property damage at the Chief Joseph Powerhouse, Micetic reviewed results of tests conducted by an independent lab in Oregon called Chemptix on the substance inside the turbines at Chief Joseph Powerhouse in an attempt to assess and provide a remedy to the property damage problems. (Ex. 1; Micetic Dep. 135:25-138:22; 176:14-177:21). After reviewing the Chemptix test results, Mr. Micetic reached certain conclusions regarding the cause of the property damage at Chief Joseph. (Ex. 1; Micetic Dep. 135:25-138:22; 140:18-144:8).

As indicated above, Mr. Micetic testified that the property damage found in the Chief Joseph Powerhouse was similar to the manifestation of the property damage at Fort Randall, namely "increased air entrainment, foaming, sticking of proportional valves and plugging of the governor in-line filters." (Ex. 1; Micetic Dep. 85:24-86:12; 107:6-18) Mr. Micetic makes this point in his report when he states that at the Chief Joseph Powerhouse, "the same pattern of events . . . as those described [in the report regarding] Fort Randall" occurred. (Ex. 2; Micetic

Report, WAG 24 in connection with WAG 22). Although, Mr. Micetic could not state that his conclusions regarding the cause of the property damage at Chief Joseph Powerhouse could be applied to the similar alleged property damage at Fort Randall, Mr. Micetic did admit that he did not have sufficient information with which to compare the causes of the similarly manifested property damage at the two sites. (Ex. 1; Micetic Dep. 84:16-22; 85:3-14). While Mr. Micetic was able to review a chemical analysis of the substance from the Chief Joseph Powerhouse he had not reviewed any analysis regarding the substance from Fort Randall. (Ex. 1; Micetic Dep. 135:25-136:7).

**The Government Asked Micetic to Compare the Property Damage at Chief Joseph with the Property Damage at Fort Randall**

At Micetic's deposition, the Government repeatedly refused to let Micetic testify regarding any issue the Government believed was outside the scope of Micetic's conclusions in his report. (*See, eg.*, Ex. 1; Micetic Dep. 87:16-89:5; 139:23-140:16). However, on cross examination, the Government asked Micetic to compare the damage he saw at Chief Joseph with the damage he saw on a video produced in discovery by Warren of the Fort Randall facility. (Ex. 1; Micetic Dep. 181:19-182:18). This issue was not within the scope of Micetic's report. (*See* Ex. 2; Micetic Report). Although Micetic, pursuant to the questioning of the Government, stated the substance from the Chief Joseph Powerhouse looked different from the alleged substance found at Fort Randall as seen on the video (Ex. 1; Micetic Dep. 182:7-18), Micetic acknowledged that the audio quality on the video was "zero", that he could not understand "a single word" spoken in the video, that the lighting on the video was "pretty dark," and that it was possible that he could not see the Fort Randall substance in the video as well as he saw the substance in person at Chief Joseph. (Ex. 1; Micetic Dep. 197:9-198:8).

**Warren and the Government Agreed to Resolve The Dispute Regarding Discovery Of Other Dam Sites After Mr. Micetic's August 31, 2005 Deposition**

Warren served requests for production of documents on the Government which requested documents related to alleged problems at other dam sites subsequent to the replacement of turbine lubricating oil, including the Chief Joseph Powerhouse. On February 17, 2005, the Government responded to these requests by objecting to the production. (Ex. 3; Defendant's Response to Third-Party Defendant, Warren Distribution, Inc.'s First Set of Requests for Production of Documents and Things, Nos. 17-20). In May, 2005, counsel for Warren indicated it was entitled to the documents responsive to these requests for production. (Ex. 4; e-mail from Warren Atty. Moynihan to Gov't. Atty. Colt dated May 26, 2005). (The type of information sought in paragraphs 23-30 of Warren's Rule 30(b)(6) Notice is encompassed in Request Nos. 17-20). In response, counsel for the Government proposed "wait[ing] until Micetic's deposition before [the Government would] throw down the gauntlet and declare that [the Government would] not produce [the documents sought by Warren's Request Nos. 17-20] and before [Warren] makes demands for such information" (Ex. 5; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan, May 31, 2005). The following chain of events lead to the scheduling of Micetic's deposition:

1. On June 3, 2005, Warren agreed with the Government's proposal that Micetic should be deposed before taking the discovery dispute over Request Nos.17-20 any further (this type of information was, also, addressed in paragraphs 23-30 of Warren's Rule 30(b)(6) Notice of Deposition directed to the Government). (Ex. 6; e-mail from Warren Atty. Moynihan to Gov't. Atty. Colt, June 3, 2005).

2. On June 30, 2005, counsel for Allied asked counsel for the Government about the status of scheduling Micetic's deposition. (Ex. 7; e-mail from Allied Atty. Stryker to Gov't Atty. Colt, June 30, 2005).

3. On July 12, 2005, counsel for the Government indicated to Warren's counsel that he was trying to set up a deposition for Micetic; and,

consistent with the above, counsel for the Government indicated that Micetic's deposition would "give . . . a clearer idea of what the scope of further discovery [would] be." (Ex. 8; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan, July 12, 2005).

4. On July 13, 2005, counsel for the Government indicated Micetic was available for an August 9, 2005 deposition in Oregon. (Ex. 9; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan, July 13, 2005).

5. On July 14, 2005, counsel for Warren initially indicated he was available for the deposition of Micetic on August 9, 2005. (Ex. 9; e-mail from Warren Atty. Moynihan to Gov't Atty. Colt, July 14, 2005).

6. On July 15, 2005, counsel for Warren, before the August 9, 2005 date had been finalized for Micetic's deposition and realizing he did have a conflict, indicated he was not available to depose Micetic on August 9th. Warren's counsel asked if it would be possible to obtain several dates for Micetic's deposition. (Ex. 9; e-mail from Warren Atty. Moynihan to Gov't Atty. Colt and Allied Atty. Stryker, July 15, 2005).

7. On July 18, counsel for the Government indicated that he will check for an alternative date for Micetic's deposition, and he requested information as to the general availability of counsel for Warren and counsel for Allied, in August and September, 2005, for depositions in Omaha or Micetic's deposition. (Ex. 9; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan and Allied Atty. Stryker).

8. On July 28, Warren's counsel provided dates of availability for himself and Allied's counsel to take depositions in August and September. These dates were:

a. August 22-August 25
b. August 29
c. August 30-September 2
d. September 6-September 9
e. September 12-September 15
f. September 19-September 23
g. September 26-September 30

(Ex. 9; e-mail from Warren Atty. Moynihan to Gov't Atty. Colt, July 28, 2005).

9. On July 28, counsel for the Government indicated Micetic was "pretty available" in August, but because of Micetic's location his deposition would have to be done alone and not part of a block of depositions. (Ex.

9; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan, July 28, 2005).

10. On August 2, counsel for the Government indicated, even if it had been available for all counsel, that the week of August 15th was not available for taking Micetic's deposition. (Ex. 10; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan and Allied Atty. Stryker, August 2, 2005).

11. On August 11, counsel for the Government indicated that the week of August 22nd would not be available for him to take depositions (Ex. 11; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan and Allied Atty. Stryker, August 11, 2005).

12. On August 15, counsel for the Government indicated Micetic was available to be deposed on August 31st. (Ex. 12; e-mail from Gov't Atty. Colt to Warren Atty. Moynihan, August 15, 2005).

Micetic's deposition took place August 31, 2005. (Ex. 1). A rough draft of the transcript for Micetic's deposition was not available until September 6, 2005, and a final transcript was not available until September 12, 2005. Following Micetic's deposition there was a block of deposition in the above-captioned matter that took place on September 7-Septmeber 8, 2005, and September 13-September 16, 2005. (Ex. 13; e-mail from Gov't Atty. Colt to Allied Atty., Stryker, August 22, 2005). Therefore, the rough and final transcripts of Micetic's deposition were received in the midst of this two (2) week block of depositions. On September 27, 2005, after having an opportunity to adequately review the transcript of Micetic's deposition, counsel for Warren asked that the Government produce the testing records for the substance at the Chief Joseph Powerhouse in light of Micetic's testimony. (Ex. 14; e-mail from Warren Atty. Buescher to Gov't. Atty. Colt dated September 27, 2005). The Government refused to provide the requested documents through an e-mail it sent Warren's counsel on September 28, 2005. (Ex. 14; e-mail from Gov't. Atty. Colt to Warren Atty. Buescher). On September 29, 2005, counsel for Warren indicated that Warren respectfully disagreed with the Government's refusal to produce the testing records for the substance at the Chief Joseph Powerhouse and that Warren

would be filing this Motion. (Ex. 14, e-mail from Moynihan to Colt dated September 29, 2005). On September 30, 2005, the counsel for the Government responded to Warren's inquiries by stating that the Government would oppose this Motion. (Ex. 14; e-mail from Mr. Colt to Mr. Moynihan dated September 30, 2005).

## III. ARGUMENT

### A. The Court Has the Discretion to Grant Leave to Allow the Issuance of a Subpoena Beyond the Fact Discovery Deadline

Pursuant to the Rule 6 of the Rules Of The United States Court Of Federal Claims ("RCFC"), "the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefore is made before the expiration of the period originally prescribed or as extended by a previous order. . . ." RCFC 6.

### B. Justice Requires that Warren Be Provided Leave to Subpoena Records from Chemoptix, LLC

Corps of Engineers Chemist John Micetic co-authored a report with Mr. Alfred D. Beitelman which discussed numerous problems the Corps of Engineers was having with replacing or adding turbine oil at several different hydroelectric facilities. (*See* Ex. 2; Micetic Report). In connection with preparing this report, Mr. Micetic reviewed tests performed by Chemoptix, LLC which included an elemental analysis of the substance found inside the Chief Joseph turbine units. (Ex. 1; Micetic Dep. 136:8-138:22).

After speaking to Corps employees and investigating similar problems at numerous facilities, including Fort Randall, Mr. Micetic concluded that the problems he saw at Chief Joseph appeared to be more widespread than just being experienced at Chief Joseph. (Ex. 1; Micetic Dep. 85:25-86:12). Indeed, in his report, Mr. Micetic described the problems at Chief

Joseph as "the same pattern of events . . . as those described in [the section of his report addressing] Fort Randall." (Ex. 1; Micetic Dep. 107:6-18).

The Government insisted throughout the deposition of Micetic that Micetic would only be allowed to testify as to the conclusions he made in his report. (*See*, *eg.*, Ex. 1; Micetic Dep. 87:16-89:5; 139:23-140:16). Despite this, on cross examination of Mr. Micetic, the Government asked Mr. Micetic to compare the property damage he saw in person at Chief Joseph with the alleged property damage he saw on a poor-quality video of the Fort Randall facility, which was a conclusion that was not a part of his report. (Ex. 1; Micetic Dep. 197:9-198:8). Thus, the Government, by virtue of this questioning and at least for the purposes of discovery, acknowledged the relevance of and opened the door to comparing the property damage at Chief Joseph to the alleged property damage at Fort Randall.

Micetic, a Corps chemist, wrote and testified that there are similarities between the manifestation of property damage at Chief Joseph and the alleged manifestation of property damage at Fort Randall. Micetic acknowledged that he did not have sufficient information with which to compare the causes of the similarly manifested property damage at the two sites. The discovery rules do not require that the information sought be admissible at trial, rather the relevance standard for discovery is that the discovery "appears reasonably calculated to lead to the discovery of admissible evidence." RCFC 26(b)(1). Seeking information with which to compare the causes of the similarly manifested property damage at Chief Joseph and Fort Randall is reasonably calculated to discovering information that may be relevant to the cause of the alleged property damage at Fort Randall. The Government has illustrated its intent to compare the substance found at Chief Joseph and Fort Randall, and attempt to distinguish the cause of the property damage at Chief Joseph from the alleged property damage at Fort Randall,

when it asked Mr. Micetic to compare what he saw at Chief Joseph with what he saw on a low quality video of Fort Randall. An appropriate and fair comparison of the similarities of the alleged property damage at Fort Randall and Chief Joseph, and the causes of that alleged property damage, cannot be accomplished through the review of a poorly lit video. Justice requires allowing Warren to obtain the easily-available elemental analyses and tests of the substance found in the Chief Joseph Powerhouse, which is in the possession of Chemoptix, LLC, so that these analyses and tests can be compared with an elemental analysis and test of the alleged substance found at Fort Randall. Warren anticipates having an elemental analysis and test of the alleged substance found at Fort Randall as part of the development of Warren's expert evidence in this matter.

**C. The Timing of Warren's Request Is Appropriate Given the Parties' Agreement to Postpone Resolution of This Discovery Dispute Until After Mr. Micetic's August 31, 2005 Deposition**

The documents at issue in this Motion are responsive to Warren's first Requests for Production of Documents (Ex. 3; Nos. 17-20). Micetic has reviewed these documents and thus they are presumably in the possession of the Government. (Ex. 1; Micetic Dep. 135:25-138:22; 176:14-177:21). In May, 2005, Warren e-mailed the Government attorneys in this matter and requested production of the documents sought through this Motion. (Ex. 4). Mr. Colt, counsel for the Government, responded by proposing that the parties wait until the completion of Mr. Micetic's deposition before the Government would determine whether it would produce the documents at issue in this Motion and the parties moved further with their discovery dispute. (Ex. 5). Given the circumstances surrounding the determination of a date for Micetic's deposition, Micetic's deposition did not take place until August 31st.

Warren has done exactly what the Government proposed. Warren waited for the completion of Mr. Micetic's deposition, narrowed and focused its document request, and brought that narrowed request to the Government's attorneys. Given the block of depositions that took place following Mr. Micetic's deposition, the timing of the receipt of the rough draft and final transcripts of Mr. Micetic's deposition and the determination, following Mr. Micetic's deposition, that the Government would not produce the elemental analyses and tests of the Chief Joseph Powerhouse substance performed by Chemoptix, LLC, the timing of this Motion is appropriate.[1]

### D. The Documents Which Warren Wishes to Subpoena Are Documents to Be Reviewed and Analyzed by Expert Witnesses

Warren seeks the Chemoptix test results in order to give its expert witness(es) an opportunity to review these results so that such expert witness(es) can compare the property damage at Chief Joseph to the alleged property damage at Fort Randall, and thereby, compare the causes of the similarly manifested property damage at the two sites. Thus, it is Warren's position that this discovery should be considered to be part of expert discovery, which has not yet closed in this case. Despite this position, Warren files this motion through an abundance of caution to be sure it preserves its rights to obtain the documents which are the subject of this Motion.

## IV. CONCLUSION

Based on the foregoing, Warren respectfully requests that the Court grant its Motion for Enlargement of the Fact Discovery Deadline for the Purpose of Serving a Subpoena upon Chemoptix, LLC.

---

[1] Warren is aware of the Court's Special Procedures Order requesting that requests for enlargement be filed "as early as possible" and "generally at least five (5) business days in advance." (Special Procedures, 4(b)). Warren requests leave to file this Motion within (5) business days due to the above-described circumstances leading up to the filing of the Motion.

Dated this 3rd Day of October, 2005.

WARREN DISTRIBUTION, INC., Third-party Defendant

By: s/Dennis J. Moynihan
Dennis J. Moynihan
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
(402) 346-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

James D. Colt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Classification Unit
1100 L Street, NW
Room 8032
Washington, D.C. 20530
James.colt@usdoj.gov

Brian D. Nolan, Esq.
Nolan, Olson, Hansen & Lautenbaugh, LLP
The Exchange Building
1905 Harney Street
Suite 800
Omaha, NE 68102
bnolan@nolanolson.com

s/Dennis J. Moynihan
Dennis J. Moynihan