IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALLIED OIL & SUPPLY, INC.,

Plaintiff,

vs. No. 03-2673 C

THE UNITED STATES,

Defendant,

and

WARREN DISTRIBUTION, INC.,

Third-Party Defendant.

ORIGINAL

---

DEPOSITION OF JOHN S. MICETIC

Taken in behalf of the Defendant

and Third-Party Defendant

August 31, 2005

* * *

BEOVICH WALTER & FRIEND

(503) 228-7201

1001 S.W. Fifth Avenue, Suite 1200, Portland, Oregon 97204

1-800-541-4452 Fax (503) 228-3078

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the deposition of JOHN S. MICETIC was taken before Tamara Aufdermauer, CSR No. 90-0199, on Wednesday, August 31, 2005, commencing at the hour of 9:13 a.m., the proceedings being reported at Army Corps of Engineers, 333 S.W. 1st Avenue, 10th Floor, Portland, Oregon.

* * *

APPEARANCES

NOLAN, OLSON, HANSEN & LAUTENBAUGH, LLP
By Susan L. Stryker
Appearing for Plaintiff

U.S. DEPARTMENT OF JUSTICE
By James D. Colt
and
ASSISTANT DISTRICT COUNSEL
By Thomas J. Tracy
Appearing for Defendant

KUTAK ROCK
By Brian C. Buescher
Appearing for Third-Party Defendant
Warren Distribution

EXAMINATION INDEX


| | Page |
|---|---|
| Examination by Brian C. Buescher | 4, 196, 210 |
| Examination by Susan L. Stryker | 164, 207, 211 |
| Examination by Thomas Tracy | 186, 208 |
| Examination by James Colt | 181, 210 |


* * *

EXHIBIT INDEX


| Exhibit No. | Item | Page |
|---|---|---|
| 48 | Document entitled Performance Problems with Group II Hydro-Cracked Turbine Oils in Corps of Engineers Hydropower Facilities, December 2004, WAG 000013-46 | 15 |


(Originals attached hereto.)

* * *

JOHN S. MICETIC,

having first been sworn, testified under oath as follows:

EXAMINATION

BY MR. BUESCHER:

Q. Good morning, sir.
A. Good morning.
Q. Could you state your name for the record.
A. John Micetic.
Q. Could you spell that for us so we have it in there appropriately?
A. J O H N, M I C E T I C.
Q. And you pronounce that Micetic, right?
A. Micetic.
Q. Micetic. Are you employed?
A. Yes.
Q. Where are you employed?
A. At the Corps of Engineers, Hydroelectric Design Center.
Q. And your offices are here in Portland, Oregon; is that right?
A. Yes.
Q. How long have you been employed here?
A. 10 years.

oxidation, and often causes improper ('spongy') hydraulic response of the governor." Do you see that?
A. Yes.
Q. Did you believe that happened based on the information you received?
A. This is a paragraph that actually should not be -- it is mistakenly plopped by the Fort Randall, because it's more like a statement about air entrainment and foaming than what somebody could assume that this is a Fort Randall problem.
Q. So is it your position that the things that are discussed here talking about the foam and the entrained air didn't necessarily happen at Fort Randall? Is that what you're saying?
A. It could have, but I have no knowledge that it did, because I was not involved. The only information that I got over the phone or emails from folks at the Fort Randall, it was after my inquiry about the governor oil, Is your oil foaming? Yes, it is. How about the proportional valves? Yeah, they're sticking. Hey, same thing at Chief Joe.
So my focus was about the governor oil and what the similarities are, rather than going into, I don't know the details, it's just assumption that

they are similar because I have never seen, never been there to see for myself.

Q. Would it be accurate to say that the information you learned about Fort Randall was -- appeared to be a similar situation as that at Chief Joseph's?

MR. COLT: Objection, leading.

A. Similar in how it sounds, but is it caused by the same reasons? That doesn't apply here, just that the final operational problems are pretty much similar as far as oh, yeah, both sumps, oil in sumps, they are foaming, and proportional valves are sticking and the filter plugging, which is pretty much the stages that could be logically followed.

It starts with air entrainment and then the varnish is built up because of the oxidation and oil is packed with oxygen and then varnish is just ever growing in the oil and slowly sticks to the sides, especially when there are tight clearances like in the proportional valves, and that's when they start sticking, but it collects in the in-line filter, too, and all the sudden it plugs the filter.

Q. After talking to Fort Randall and other facilities, did you conclude that the problems that you were

seeing at Chief Joseph appeared to be more widespread than just at Chief Joseph?

A. Correct.

Q. Based on the investigation you did, did it appear that problems were similar to that at Chief Joseph at the other places?

A. They were the same or similar, actually, manifestations of the problem.

Q. And those manifestations being what?

A. Being increased air entrainment, foaming, sticking of proportional valves, and plugging of the governor in-line filters.

Q. If you would take a look at the Fort Randall section, it starts, let's start with the sentence saying, "Foam hinders dissipation," do you see that?

A. Uh-huh.

Q. If you go all the way down to the sentence, "Varnish particles, in combination with other contaminants," to the end of that sentence?

A. Correct.

Q. That section right there, it discusses various issues. Is that the section that you thought wasn't necessarily discussing Fort Randall, it was just generally discussing the foam and other

issues?

A. Correct.

MR. TRACY: Just to clarify, what about the sentence after it?

THE WITNESS: The same, just a connection on it, because it's kind of a follow-up that actually they are accumulating and plugging in-line filters. It's pretty much a statement that is not specific to the Fort Randall. It's more like a stating what the problem was experienced at Chief Joe, but because of the similarities that they are saying that they had the experience foaming and sticking of proportional valves and plugging of the filters, it was assumed that it could have been the same thing, but it was just a -- no base of -- on facts.

Q. BY MR. BUESCHER: Do you know whether any compatibility testing was done at the Fort Randall facility?

A. I don't.

Q. Do you believe compatibility testing should have been done if it wasn't?

MR. TRACY: Objection.

MR. COLT: Objection.

MR. TRACY: That's going to go beyond the scope of this report.

MR. BUESCHER: Are you instructing him not to answer the question?

MR. COLT: Could you repeat the question, actually.

(The reporter read back as follows:

Do you believe compatibility testing should have been done if it wasn't?)

MR. COLT: Actually, yeah, that would be beyond the scope of the report, because he already said that he never went to Fort Randall. So yes, I am instructing him not to answer.

(Instruction by counsel.)

MR. BUESCHER: Just for the record, I think that is a question that we would be entitled to an answer based on the fact that some of his conclusions here that compatibility testing should be done, so that's a question directly related to his conclusions in the report.

MR. TRACY: Again, his report is actually saying compatibility testing should be done effective December 2004. He is not stating and this report has nothing to state as far as any time previous to that, and since Fort Randall was in 1998, this report has nothing to do with anything retroactive. This is a prospective report, and I

think he has testified to that.

MR. BUESCHER: I'm not sure that we have that testimony.

MR. COLT: Well, your objection is noted and we are instructing him not to answer.

Q. BY MR. BUESCHER: Is there anything about the Fort Randall Powerhouse that you know that we haven't discussed yet?

MR. COLT: Objection, that is so broad and --

MR. TRACY: I think you can just leave it at that.

MR. COLT: I'm sorry, you need to ask a more specific question than that. Objection. I'm going to instruct him not to answer the question as stated. You're going to need to be more specific than that.

(Instruction by counsel.)

Q. BY MR. BUESCHER: Do you know anything else about the problems experienced at Fort Randall besides what we've discussed?

MR. COLT: Objection, are you -- first of all, are you asking about that went into his forming the report?

MR. BUESCHER: I'm just asking him, he's got a section in here about Fort Randall Powerhouse and

A. No.
Q. Were you able to come to any conclusions as to why you thought the increase of foaming and air entrainment was taking place?
A. No.
Q. Go on to talk about Chief Joseph on page 6. At Chief Joseph Powerhouse in Washington, the facility replaced old Group I oil with new Group II oil. Is that right?
A. Correct.
Q. And your report states that "A few months later, the same pattern of events was noticed as those described in Fort Randall." Is that right?
A. Correct.
Q. What pattern of events would that be?
A. It would be foaming of the oil in the governor sump, sticking of the proportional valves, and plugging of in-line filters.
Q. You mentioned earlier that you had pretty substantial involvement with Chief Joseph in addressing their problems. Is that right?
A. Correct.
Q. Did you come to any conclusions as to why this happened at Chief Joseph?
A. I can speak to the governor application because

A. No, I don't.
Q. Do you know how many powerhouses the Corps has?
A. I don't know an exact number.
Q. Do you know an approximate number?
A. I don't.
Q. Below that, it says, total number of turbine units, 216, and below that they list several different kind of turbines, the Francis and the Kaplan?
A. Right.
Q. Do you know what kind they have at Fort Randall?
A. They have Kaplan turbines.
Q. Do you know, could you describe to me the differences between these turbines?
A. Kaplan turbines, they have an adjustable pitch blade. Francis turbines, they're a different design with no -- with no adjustability. And the fixed blade, pretty much like the Kaplan turbines, but with no ability to adjust. They're just fixed. Some of them are vertical, some of them slanted, and that's about it.
Q. Did you notice any differences in how any of these types of turbines responded to Group II oil as compared to other types of turbines?
A. No.
Q. If you look at the first survey question you have

here, "Have you experienced an unusual increase of foaming or air entrapment after your oil has been replaced?" Would it be correct that five powerhouses answered yes to that?
A. Correct.
Q. Do you know what powerhouses those were?
A. I will have to take a look at the survey. I just can't memorize all of them.
Q. Do you think Fort Randall was one of those?
A. Yes.
Q. Do you think Chief Joseph was one of those?
A. Yes.
Q. Do you think Ozark was one of those?
A. Yes.
Q. Second question page 10, the question asks the responder to describe the causes of the problems, extent, and any corrective action. Do you see that?
A. Yes.
Q. And two people -- two powerhouses answered that there was foaming and air entrainment in the governor oil. Do you see that?
A. Yes.
Q. Do you know who those would be?
A. I don't.

be looked at.

Q. BY MR. BUESCHER: Did they have an opportunity -- excuse me. Did the powerhouses have an opportunity to give you written answers along with, you know, just checking -- just saying whether or not they had foaming and air entrainment of the governor oil, for example?

A. At the end of the survey, there is a place for the comments where they can expand if they choose so.

Q. Did anyone expand on the survey?

A. Yes.

Q. Do you know who they were?

A. I don't.

Q. Do you recall if Fort Randall did?

A. I don't.

Q. Do you recall if Chief Joseph did, by chance?

A. I think Chief Joseph did.

Q. Do you know what they said, Chief Joseph said in those additional comments?

A. I will have to look at it.

Q. And you have those survey responses in your office; is that right?

A. Yes.

Q. If you go to the third question on page 10, "Have you experienced operational difficulties caused by

sticking of governor valves or filter clogging after oil was replaced or makeup oil has been added?" Do you see that?

A. Yes.

Q. Eight entities responded yes. Do you see that?

A. Yes.

Q. Do you know which eight entities those were?

A. No. I will have to take a look at the survey responses.

Q. Sure. Do you happen to know like if certain ones you know for sure would have responded yes to that?

A. I would think all of the -- it would be Fort Randall, it would be Chief Joe, Ozark, pretty much the ones that this report mentions.

Q. Do you happen to know from among those eight entities that answered in the affirmative which ones had their filters clogged and which ones didn't, if there was such a distinction?

A. No, I don't.

Q. If you go on to the last question on page 10, describe the cause of problems, the extent and corrective action. Do you see that?

A. Yes.

Q. Valves were varnishing becoming sticky -- became sticky, that was eight responses in the

Q. And why is that?
A. A lot of the varnish that was built by the system but it was never a problem or never seen because a lot of it was dissolved in the Group I oil because of its solvency. Group II oils have much less solvency characteristics. They just cannot absorb that much of the varnish that is generated by the system itself, so in that case, you need some means to keep that ever-growing number in check. That's why a filtration system would supplement the low solvency of Group II oils.
Q. If you go to page 18, Sludge Analysis?
A. Yes.
Q. The first sentence, "The purpose of forensic analysis of sludge from in-service filters was to determine its composition and the chemistry of its formation." Do you see that?
A. Yes.
Q. What forensic analysis was done?
A. The samples of the plugged filter was brought to -- or sent to a laboratory that does forensic analysis, and the idea was to figure out how the sludge was formed to be able to troubleshoot back and see how to prevent formation of it.
Q. So what sludge did you analyze, then, from what --

A. Sludge from a governor in-line filter at the Chief Joe Powerhouse.
Q. Did you do any forensic analysis aside from that?
A. No.
Q. Did you review any reports from Fort Randall regarding any sludge analysis?
A. No.
Q. That section goes on to say, "The data indicated a high load of wear and dirt particles and carboxilate salts, which form as the result of a reaction between the acidic rust inhibitor in the Group I oil and metallic cations -- most often iron, zinc, and copper."
Do you see that sentence?
A. Yes.
Q. Could you explain to me what that means?
A. That was the report from the lab, and after discussing that report with the analyst that actually did analysis, we came to the conclusion of how that certain parts came about to be in oil, so carboxilate salts base -- carboxilate is base for some of the additives, so there was an idea that maybe there was the used-up additives from the previous oil that was there. The same like succinimides that are actually additives from the

new oil, but they were already used up, worked up, and they were picked up by filter.

So that was -- there is a lot of wear metals in the oil. There are some dirt particles in the oil. At the low temperature, the varnish was agglomerating in that cold, thick oil, and whatever was on their way was encapsulated. It was not the chemical bound, but actually some sort of physical bound, just the agglomeration. And that was -- the theory is based on a report where it says once the solution was heated up, that thing just disappeared.

So it is -- it definitely brought more energy with temperature to those varnish particles and they just separated inside.

Q. What report are you referring to?

A. Chemoptix.

MS. STRYKER: Could you repeat that.

THE WITNESS: Chemoptix.

Q. BY MR. BUESCHER: What's Chemoptix?

A. That's the name of the laboratory.

Q. It's a -- did Chemoptix issue the report on the sludge at --

A. Correct.

MR. COLT: Chief Joe.