IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALLIED OIL & SUPPLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 03-2673C |
| | ) | |
| Defendant, | ) | (Chief Judge Damich) |
| | ) | |
| and | ) | |
| | ) | |
| WARREN DISTRIBUTION, INC., | ) | |
| | ) | |
| Third-Party Defendant | ) | |

DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR ENLARGEMENT OF FACT DISCOVERY DEADLINE
FOR THE PURPOSE OF SERVING A SUBPOENA UPON CHEMOPTIX, LLC

Pursuant to Rule 7.1 of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submit's the following brief in opposition to Warren Distribution's motion to enlarge fact discovery to serve a subpoena upon a third-party, Chemoptix.

QUESTION PRESENTED

Whether this Court should allow the expansion of discovery to problems not at issue in this litigation at a site that is not part of this litigation.

STATEMENT OF FACTS

Origin Of Gel Problems

The Army Corps of Engineers contracted with Allied Oil and Supply for turbine lubricating oil to replace existing oil at a dam site at the Ft. Randall dam, in South Dakota. Allied Oil obtained the lubricant from Warren Distribution, in Omaha, Nebraska. Soon after

delivery, samples of the oil began showing cloudiness from some oil component settling out of solution. However, under assurances from Allied Oil, the Corps proceeded to replace the existing oil with that which Allied Oil supplied. Eventually, it was discovered that the insides of the turbine units were covered with a vaseline-like substance, which all parties agreed would have to be removed to prevent a possible future failure of the machinery. An employee of Allied Oil has testified that the president of Warren Distribution, Mr. Robert Schlott, stated at a June 22, 1999, meeting at Warren Distribution to discuss the gel forming in the oil, Mr. Schlott stated that Warren Distribution had used an additive and that "he had insufficient information and research resulting in [the] problem with [the] additive." Attach. A at 64-65. The president of Allied Oil, Mr. Conrad Heinson, testified that discussions with Mr. Schlott showed that Mr. Schlott was aware of additive falling out of the oil. Attach. B at 53. In a March 15, 1999, letter to Allied Oil, Warren Distribution identified "partial fall-out" of the silicone-based additive as a likely cause of the "gelatinous precipitate" with three other possible contributing causes specific to Ft. Randall. Attach. C. Mr. Schlott has since testified that nothing has changed Warren Distribution's opinion that the likely cause of the gel was anti-foaming additive falling out or contamination after purchase. Attach. D at 39-40.

<u>Losses Resulting From Gel Throughout Turbine Units</u>

After futile attempts to flush out the substance without dismantling the turbine units, the parties agreed that the units would have to be taken down to have the gel removed. The Government incurred $305,762.67 in labor costs involved in dismantling the generators as well as $334,643.20 in lost revenue from the peak generating hours during which the halted units could not generate power. The Government had previously scheduled maintenance on three of

the units, for which it would have taken the units down in any case, and for which Allied Oil was, accordingly, not charged. The Government has also assessed $18,001.08 in laboratory costs associated with testing the replacement oil. The Government has provided its laboratory tests in discovery.

Allied Oil and Warren Distribution, who had been involved in the process from the beginning, supplied replacement oil at no further cost to the Government. The president of Allied Oil, Mr. Conrad Heinson, later told his employees that replacement oil would be supplied because the oil Warren Distribution had initially supplied was "off spec." Attach. A at 43. None of these parties supplied oil to the Chief Joseph dam.

Beginning Of Litigation

Allied Oil and Warren now dispute that their oil caused the gel to form and that they are liable for costs resulting from the removal of the gel or the testing of the replacement oil. In response to the contracting officer's decision assessing the above-stated costs, Allied Oil filed this lawsuit. Allied Oil served notice upon Warren Distribution, which became a third-party to this case.

Attempt To Expand Fact Discovery

Warren Distribution served discovery requests early in discovery inquiring whether other dam sites had encountered problems "similar" to those at Ft. Randall. Attach. E, Interrogatory Number 2. From its earliest discovery responses served upon Warren Distribution and Allied Oil on February 17, 2005, the defendant maintained that no other dam sites had experienced the problems with gel developing throughout the turbine units, as occurred at Ft. Randall. Attach E, Interrogatory Number 2. Warren Distribution propounded interrogatories requesting information

about other dam sites regarding "problems of any kind subsequent to the replacement of turbine lubricating oil." Attach. E, Interrogatory Number 8. The defendant's February 2005 responses stated that no other dam site had experienced the formation of gel throughout turbine units and that discovery on other matters at other dam sites were impermissibly burdensome because they were "unlikely to lead to the discovery of admissible evidence insofar as [they were] not restricted to matters that relate to the subject matter of th[is] lawsuit." Id. The Government's position on that point never changed and, in the eight months that followed, Warren Distribution never disputed this aspect of defendant's discovery responses.

Subsequent to these discovery responses, the parties discussed depositions, which Warren Distribution elected to conduct pursuant to RCFC 30(b)(6). Warren Distribution provided undersigned counsel with 55 subjects upon which it sought to conduct depositions. Subjects 23-30 of these 30(b)(6) depositions involved "problems" at other dam sites. Defendant produced 30(b)(6) deponents regarding all issues centered around events at Ft. Randall. However, it indicated to opposing counsel, that, in accordance with the position it had taken since the beginning of discovery, it would not produce a 30(b)(6) deponent for matters 23 through 30. Counsel for Warren Distribution inquired whether the "Government wishes to maintain its position that the subject matters set forth in paragraphs 23-30 are beyond the scope of permissible discovery." Warren's Ex. 5. Government counsel responded several days later that it maintained its position that, because no other dam site had experienced the formation of gel throughout turbine units, other dam sites were not relevant. Warren's Ex. 6. As a means of resolving the deposition question, the parties agreed that, since a report regarding governor systems that Mr. Micetic had written was the basis for Warren Distribution's interest in other

dam sites, Mr. Micetic would make himself available to testify about the problems covered in his report. Id.

Micetic Compromise Deposition

After several rounds of depositions in Omaha, Nebraska, the parties were finally able to schedule Mr. Micetic's deposition for August 31, 2005. Mr. Micetic testified that his report involved a sludge that had formed only in the governor systems at certain dam sites. Attach. F at 23-24. He further testified that he was aware of problems with gel in turbine units at Ft. Randall and considered that different from what he was discussing in his report. Id. at 93. He further testified that the sludge observed at dam sites, including Ft. Randall, dissolved when the temperature of the governor units was heated to 40 degrees Centrigrade (104 degrees Fahrenheit). Id. at 183. In response to a question from Allied Oil counsel, Mr. Micetic further testified that the normal temperature of the thrust bearings where the Ft. Randall gel formed was regularly between 65 to 75 degrees Centigrade (149 to 167 degrees Fahrenheit). Id. at 177. Because the agreed purpose of the deposition had been to ascertain the likelihood that the governor problems at dams such as Ft. Randall were the same as the gel that only formed throughout the turbine unites at Ft. Randall, Government counsel had Mr. Mictetic watch a tape provided by Warren Distribution that showed the gel on dismantled thrust bearings at Ft. Randall. Mr. Micetic testified that the governor sludge discussed in his report was different in color and texture from turbine unit gel observed at Ft. Randall. Id. at 182, 208.

Remainder of Fact Discovery

During two subsequent rounds of depositions conducted in Omaha, Nebraska, involving the same attorneys that participated in the Micetic deposition, Warren Distribution did not renew

its effort to expand discovery to other dam sites. On September 27, 2005, Warren Distribution requested test results from Chief Joseph. Warren's Ex. 14. Government counsel responded the next day noting that this case was about labor and power costs due to cleanup of a gel that had formed throughout turbine units. Id. Defendant further noted Warren Distribution's prior interrogatories that made broad inquiries into "problems of any kind" at other dam sites. Id. The message further noted that Warren Distribution had accepted our proposal to use a Micetic deposition to examine whether Ft. Randall's gel was akin to the substance examined in his report and further noted the profound differences of substance type, location and conditions of formation, and appearance to which Mr. Micetic had testified. Id. Government counsel finally noted that "[i]f we do not limit this case to problems seen at Ft. Randall and allow this to drift into examinations of oil tests and unrelated issues at different dam sites, this case will literally have no end. That was [the Government's] position 8 months ago when we responded to your interrogatories and it remains unchanged less than one week prior to the end of discovery." Id. On September 29, 2005, Warren Distribution inquired whether we would oppose a motion seeking to allow discovery on other dam sites. Id. Government counsel explained that, for reasons already explained, the Government would oppose such a motion. Id. Fact discovery ended on October 3, 2005.

## ARGUMENT

### I. Questions About Allowing An Expansion Of Discovery Are Within The Discretion Of This Court

"The Federal Circuit has instructed that 'questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court.'" Vons Companies, Inc. v. United

States, 51 Fed. Cl. 1, 5 (2001) (quoting Florsheim Shoe Co. v. United States, 744 F.2d 787, 797 (Fed. Cir. 1984)). "Trial court enjoy broad discretion in controlling discovery." Shell Petroleum, Inc. v. United States, 46 Fed. Cl. 583, 585 (2000). Pursuant to RCFC 6(b), questions of enlargement are similarly within this Court's discretion.

II. Warren Distribution Seeks, At The End Of Fact Discovery, To Expand Fact Discovery To Include Other Matters At Other Places Despite The Manifest Uniqueness Of The Phenomena At Ft. Randall That Gave Rise To This Litigation

Warren Distribution's motion is an expansive proposal made to appear modest. It's motion ostensibly seeks to extend discovery for the sole purpose of obtaining tests from a third party. However, their motion constitutes an attempt to persuade this Court to extend the reach of discovery to other dam sites that did not experience the same gel throughout turbine units. It has the effect of mingling the unique gel problems at Ft. Randall that gave rise to this litigation with other issues at other places. Among the many issues that dam sites face, Ft. Randall and other locations may have faced problems with governor filters clogging with dark sludge. However, this litigation is not occurring because of sludge restricted to governors. The labor and lost power generation costs that gave rise to this litigation were incurred because the Ft. Randall turbine units had a light colored substance comparable to vaseline forming throughout the turbine units. It was the need to clean this gel from parts of the dam site that were far more inaccessible than the governor units that led to these extensive costs for labor and lost power generation. As we indicated in our responses 8 months ago to Warren Distribution's Interrogatory Number 8 regarding "problems of any kind" at other dam sites, any proposal to include other problems in discovery beyond gel forming throughout turbine units is potentially limitless and there is no reason to believe that its extension would end with this motion. Attach. E, Interrogatory No. 8.

Fact discovery revealed that no other dam site experienced the development of this light-colored substance throughout the turbine units. Fact discovery revealed as well that both Allied Oil and Warren Distribution had discussed as a likely cause of the gel the fallout of an additive from the oil Warren Distribution had blended. Attachs. A-D. Warren Distribution has never challenged the Government's responses to its interrogatories and document requests from 8 months ago. It still does not challenge the Government's refusal to provide deponents to discuss unrelated dam sites that did not develop a gel throughout the turbine units. Instead, Warren Distribution proposes to conduct further fact discovery[1] on "problems" at other places even though the Government's position from the beginning has been that the Ft. Randall gel formation was unique, both in its nature, its location in the turbine units, and the resolution that it required.

Given that Warren Distribution's interest in other dam sites was based upon a report that Mr. Micetic had written about sludge problems in the governors of various dam sites, the Government proposed to resolve Warren Distribution's questions by allowing a deposition of Mr. Micetic. That deposition took place more than one month prior to the end of fact discovery. Warren Distribution agreed to this solution. Mr. Micetic testified that his report was only concerned with a governor sludge problem that had developed at other dam sites, including Ft. Randall. He further testified that the problems he identified as common to the various sites involved a sludge that was confined to the governor units of the affected sites. Attach. F at 23-24. Considering that the purpose of the agreed-upon deposition was to probe whether Mr.

[1]Warren Distribution proposes that its motion "should be considered to be part of expert discovery." Pl.'s Br. at 16. However, this Court has held that a party may not style as expert discovery factually-based information that doesn't require the opinion of an expert and that could have been obtained during fact discovery. See Shell Petroleum, 46 Fed. Cl. 583, 585-586 (2000).

Micetic's investigations gave any reason to believe that the Ft. Randall gel had appeared at other sites, Mr. Micetic viewed a tape provided by Warren Distribution that showed the gel in other parts of the Ft. Randall turbine units. Mr. Micetic testified that the governor sludge described in his report was dark and had a sticky texture. Attach. F at 182, 208. The Ft. Randall gel that he observed on the tape was lighter and comparable to vaseline. Id.[2] Most importantly, the governor sludge that Mr. Micetic studied disappeared at temperatures of 104 degrees Farhenheit, while the Ft. Randall gel developed and persisted in parts of the turbine units that Mr. Micetic, through his experience as a Corps. engineer and interactions with other engineers and turbine experts, knew had regular temperatures between 149 and 167 degrees Fahrenheit. Attach. F at 183, 177, 210. Whatever similar governor sludge problems Ft. Randall and other dams may have experienced, Mr. Micetic confirmed that, in both nature, location, and resolution, the turbine unit gel that Ft. Randall experienced was not repeated at other dams that he had studied.

Warren Distribution's interest in the other dam sites was based upon the Micetic report. Pl.'s Exs. 6-7. The parties agreed upon the Micetic deposition as a means to explore whether Ft. Randall's turbine unit gel was repeated at any other dams. Id. Mr. Micetic's testimony showed the unique nature of Ft. Randall's gel. However, despite the parties' discussion of gel causes, such as additive fallout that are unique to Warren Distribution's blending of the oil it supplied to Ft. Randall, Warren Distribution still seeks to renew fact discovery issues about problems and

[2]In response to questioning from Warren Distribution's counsel, Mr. Micetic said that the lighting of the video was "sometimes better, sometimes worse" but that lights were shining down into the turbine units. Under further questioning, Mr. Micetic admitted that it was "possible" that he could not see the Ft. Randall turbine unit gel as well as he had seen the governor sludge at another site. Attach. F at 197-198. However, as the author of the report upon which Warren Distribution is basing its interest in governor sludge, Mr. Micetic saw only dissimilarities between the two substances.

places that are not involved in this litigation. Justice does not require allowing them to do so at this late stage.

CONCLUSION

For the foregoing reasons, we respectfully request that this Court deny Warren Distribution's attempt to expand fact discovery in this case.

Respectfully submitted,

PETER D. KEISLER.
Assistant Attorney General

DAVID M. COHEN
Director

s/ James M. Kinsella
JAMES M. KINSELLA
Deputy Director

s/ James D. Colt
JAMES D. COLT
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L. Street, NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 514-7300
Fax: (202) 307-0972

October 20, 2005

Attorneys for Defendant

**Attachment A**

**Attachment B**

**Attachment C**

**Attachment D**

**Attachment E**

**Attachment F**

CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2005, a copy of the foregoing DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR ENLARGEMENT OF FACT DISCOVERY DEADLINE FOR THE PURPOSE OF SERVING A SUBPOENA UPON CHEMOPTIX, LLC was filed electronically. I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ James D. Colt