# Attachment A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ALLIED OIL & SUPPLY INC., Plaintiff, | CASE NO. 03-263 C |
| vs. | D E P O S I T I O N |
| THE UNITED STATES, Defendant | |
| and | COPY |
| WARREN DISTRIBUTION, INC. Third-Party Defendant. | DEPOSITION TAKEN ON BEHALF OF DEFENDANT |

DEPOSITION OF GARY CHRISTIAN, taken before Deborah M. Fernau, Court Reporter and Notary Public for the State of Nebraska, beginning at 9:00 a.m., on the 6th day of September, 2005, at the offices of NOLAN, OLSON, HANSEN & LAUTENBAUGH, L.L.P., 1905 Harney Street, Omaha, Nebraska.

** ** ** ** **

THE WITNESS: Does that mean I answer?

MS. STRYKER: If you know.

A. What's the correct answer here? I'm just -- Yes, I --

Q. (By Mr. Colt) Do you know why Allied Oil supplied the replacement oil?

A. Yes.

Q. Why did Allied Oil supply the replacement oil?

BUESCHER: Object to form and foundation.

MS. STRYKER: Join.

A. Because the original oil was off spec.

Q. How was it "off spec"?

BUESCHER: Objection to foundation.

MS. STRYKER: Join.

A. That, I don't have a clue.

Q. (By Mr. Colt) Did somebody tell you it was off spec?

A. Yes.

Q. Who?

A. Conrad Heinson.

MR. COLT: Very good. For the record -- and I'm going to have this marked as Defendant's Exhibit 3 to the deposition. I'm having pages Bates numbered 2021, 2022, 2027, 2028, 2031 marked, collectively, as Defendant's Exhibit 3.

(Exhibit No. 3 was marked for identification.)

MS. STRYKER: Can we go off the record for just a second?

MR. COLT: Yes.

(An off-the-record discussion was had.)

MR. TRACY: Back on the record.

MR. COLT: Back on the record.

To clarify, the one that Mr. Christian identified as not being his handwriting is stamped Bates No. 2030 of Allied Oil's document production.

Q. (By Mr. Colt) Could you please take your time to look those over and let me know when you've refreshed your memory?

A. Okay.

Q. You've reviewed them?

A. Yes.

Q. So you remember taking these notes?
A. Yes.
Q. Let's refer to the first two pages.
A. Okay.
Q. If I'm correct, I believe these are your notes from a June 22nd, 1999 meeting; is that correct?
A. Yes.
Q. And did this meeting occur at Warren Oil?
A. Yes.
Q. And am I reading that right, that you, Jim, and Jim Kirk were representing Allied there?
A. That's correct.
Q. And representing Warren was Bob Schlott, Tim Weeda, Bob (sic) Tabor; is that correct?
A. It's Bud.
Q. Bud Tabor?
A. Yes.
Q. And then from the Corps there was Ron Gall and Ron Buckerman?
A. Yes.
Q. Is that correct?

A. Uh-huh.
Q. If I'm reading correctly, it says the "Corps brought some suspect samples." Is that a correct reading?
A. Yes.
Q. What did you mean "suspect samples"?
A. The samples with the white substance of cloudy in them (sic).
Q. But what did you mean "suspect"?
A. When you have a sample that appears to have something in it, it's suspected of being off spec, find out what that is, you know.
Q. And your next notation is, "Warren to send to Lubrizol to test overnight"?
A. Yes.
Q. Is that a correct reading?
A. Yes.
Q. And were you referring to the samples?
A. Yes. Yes.
Q. Going down to what would be, probably, the second full paragraph on the page, it says, "Bob S. stated to Corps that new product was combination of cat 1 and 2 base

stock." Am I reading that correctly?
A. Yes.
Q. Would that be Category 1 and 2?
A. Right. Yes.
Q. As conversation went on stated that last year's product was Dow package, he had insufficient information and research resulting in problem with Dow additive; is that correct?
A. That's what I wrote. Where you had -- after "stated that last years (sic) product," the W slash means with Dow package.
Q. All right. And could you read the rest, please?
A. He had insufficient information in research equals resulting in problem with Dow additive.
Q. Do you remember Mr. -- Was this Mr. Schlott saying this?
A. Yeah. Bob Schlott. Bob S., Bob Schlott.
Q. We, (Allied) brought in sample of 6-10 -- Would that be June 10th?
A. Yes.
Q. -- of the June 10th "load taken at Allied and it was suspect (something in

bottom)."

A. Correct.

Q. And I believe, if my memory is correct, referring to -- on Exhibit 2, that we showed you -- or actually, Exhibit 1, you had your own notation that you made; is that correct.

A. Yes.

Q. What was the white stuff in the bottom of this sample? Is that correct? So was that the same load --

A. That's the sample referred to in this note at that meeting (indicating).

Q. Then the last notation on the next page, Bates stamped 2022, your last sentence, I believe it says, Corps is to get back to us on when and where samples are taken before or after filter while unloading; is that true?

A. Yes. I misspelled us.

Q. We all misspell occasionally.

A. Yes, that's correct.

Q. So what was your understanding of when these samples were taken?

A. We -- From that point forward, on replacement oil, we furnished a filter so it

**Attachment B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ALLIED OIL & SUPPLY, INC., ) CASE NO. 03-02673
)
Plaintiff, )
)
vs. )
)
THE UNITED STATES OF )
AMERICA, ) DEPOSITION TAKEN
) ON BEHALF OF THE
Defendant, ) UNITED STATES
)
And )
)
WARREN DISTRIBUTION , INC.,)
)
Third-Party )
Defendant. )
)

DEPOSITION OF ROBERT "CONRAD" HEINSON

taken before Vickie L. Quinn, Court Reporter and Notary Public for the State of Nebraska, beginning at 9:15 a.m., on the 14th day of September, 2005, at 1905 Harney, Suite 800, Omaha, Nebraska.

** ** ** **

interpose an objection on foundation.

MR. BUESCHER: Objection to foundation.

MR. NOLAN: You may answer if you can.

Q (By Mr. Colt) Do you remember discussing with Mr. Schlott gelatinous precipitate?

MR. BUESCHER: Objection. Foundation.

Q Do you remember --

A The conditions of this, but I don't remember this letter particularly, but.

Q Okay.

A What transpired, I think, is reasonably in here. I can't say for sure just exactly how, but.

Q Okay. Do you -- But do you remember discussing the gel that was falling out with Mr. Schlott?

MR. BUESCHER: Object to form and foundation.

A Well, it was discussed in the company if they might want to listen to us, but I can't remember exactly what comments I made to Mr.

Schlott.

Q As you --

A Mr. Schlott had the samples of it. He knew -- I didn't have to tell him, I got samples here and they got clouds in 'em. Mr. Schlott had the samples of the product. He had his own laboratory. He knew what he was doing.

Q Do you see further down there is a sentence beginning with "Some of these are," and there is 1, 2, 3 and 4?

A Yes.

Q Do you see that?

A Yeah.

Q And I believe Mr. Schlott is proposing some, what he believes to be, causes of this.

A Yeah.

MR. BUESCHER: Objection to form and foundation.

Q Do you recall Mr. Schlott discussing the causes he identifies here with you?

MR. BUESCHER: Objection to form and foundation.

A I didn't recall the letter, and I probably don't recall talking to him about this even.

Q Well, do you recall Mr. Schlott discussing moisture in the system?

A No, I don't, but if he discussed it with me, I'd have bitched, because I don't deliver wet oil that I picked up. So I don't know.

Q Do you recall Mr. Schlott discussing with you residue in the system?

A It was discussed, but I can't recall any details about it or anything like that, you know.

Q Okay. Do you recall Mr. Schlott discussing with you partial fallout of the silicone-based antifoaming agent?

A General discussion. I can't recall anything specific to this.

Q Do you recall anything in general about it?

A He was aware of it. That's about all I recall of it.

Q Did he say anything to you about it?

A According to this letter, he must have, but I can't recall when or what he said about it.

Q In the next sentence, if you can see

**Attachment C**

**Warren Distribution**

727 South 13th Street Omaha, NE 68102 (402) 341-9397

March 15, 1999

Conrad Heinson
Allied Oil and Supply
2209 South 24th Street
Omaha, NE 68103

Dear Con,

We'd like to resolve the concerns with the turbine oil supplied to US Army Corp of Engineers in a manner which fairly addresses the interests and concerns of Allied, The Corp and Warren. As we have considered the information surrounding the formation of gelatinous precipitate in the turbine oil reservoirs, there are a number of factors which are likely contributors to the problem. Some of these are 1) moisture in the system, 2) residue or sediments of old hydraulic oils in the system as evidenced by the zinc and other elements not present in the new oil but found in the filter residue 3) partial fall-out of the silicone based anti-foam agent in the new oil, and 4) the presence of wiping towel residue in the system. We readily acknowledge that some drop out of the silicone antifoam occurred, but we believe that in itself would not cause problems of the consequence observed were the system clean of all the other contaminants mentioned above. However, we also recognize that the fluid which is presently in the reservoirs poses potential system failure problems because of the contaminants and would suggest that the fluid now in the systems be again replaced with new fluid at the earliest possible date. This replacement should be with a fluid containing non-silicone based antifoam and should be accompanied with thorough cleaning of the systems to insure against a repeat of silicone - contaminate coagulation and drop out.

Our proposal is for Warren to provide replacement hydraulic fluid on a no charge basis, for Allied to pay for and provide transportation for the replacement fluid to Pickstown and for the used fluid back to our plant, and for the Corp's to pay for and perform the maintenance effort which would be involved in changing out the fluid.

If this proposal is accepted, we'd like to provide samples of the replacement fluid to the Corp for their approval prior to shipping out bulk quantities so they could perform all necessary testing and provide basic fluid approval prior to shipping. While we'd expect the Corp to test shipments upon arrival, as stipulated in the original contract, if deliveries matched the quality of the tested and preapproved samples, the replacement fluid would be accepted as suitable.

We would bill the replacement fluid to Allied at the same pricing previously established, and credit Allied that same pricing for the used fluid returned to our plant. It would be important to us that the returned hydraulic fluid not be contaminated with any other used oils, as we would hope to filter and reuse it for some low value applications such as chain oil.

Con, if Allied and the Corp are agreeable to this approach to solving the concerns, we should have a letter of agreement drawn up to document acceptance of this solution. Our primary interest is having a fair resolution of this issue that leaves Allied and the Corp feeling their interests have been properly protected.

Sincerely,

Robert N. Schlott

WAG 000575