# Attachment D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ALLIED OIL SUPPLY, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Case No. 03-2673C<br>TAKEN ON BEHALF OF DEFENDANT |

DEPOSITION OF ROBERT SCHLOTT, taken at 9:00 a.m. on May 10th, 2005, by Gary Thibault, General Notary Public in and for the State of Nebraska, taken at 1650 Farnam Street, Omaha, Nebraska.

ORIGINAL

Warren's view change?
A. Yes.
Q. When?
A. That's a result of additional information that we've developed with additional testing, and that leads us to believe that the oil that we provided, had the systems been cleaned, there would not have been a problem.
Q. Well, in that letter you refer to the possibility that there may have been contaminates in the system or in transport or after they left Warren; is that correct?
A. That's correct.
Q. So that was already on Warren's mind at the time this letter was written, wasn't that correct?
A. That those contaminates could have caused -- contamination could have caused the problem?
Q. That Warren was aware of that possibility at the time you wrote that letter?
A. I'm sorry. Help me. With what possibility? That we were aware of what?
Q. The possibility that there were contaminates that got into the oil after it left

Warren Distribution?

A. Yes. We felt that that was, that was part of the issue.

Q. Did anything else occur that changed your thinking --

A. No.

Q. -- after that letter was written?

A. No. I think -- our thinking has continued to be -- supported that the cause for the problems had to do with contamination that occurred after the oil left our premises.

Q. Did you get any test results that debunked the idea that the antifoaming agent fell out of the solution?

A. I'm not aware that we did.

Q. I'm going to refer you to a handwritten note provided in Allied Oil documents production at Bates Number 2074, and I'd like it marked as Defendant's Exhibit 4, please.

(Deposition Exhibit Number 4 was marked for identification.)

Q. Please review that.

A. Okay.

Q. Is that your handwriting?

A. Yes, it is.

# Attachment E

Interrogatory Number 2:

Identify other dam sites, within the last ten (10) years, for which Defendant, the United States, is or was responsible, that developed alleged problems similar to those alleged in the above-captioned matter subsequent to the replacement of turbine lubricating oil.

Response:

Defendant objects to this interrogatory as unduly burdensome to the extent that it involves several federal agencies and departments outside of the United States Army Corps of Engineers, Omaha District. Defendant further objects that terms such as "problems" and "similar" are vague. Subject to that those objections, there are no known other dam sites for which the Army Corps of Engineers is responsible where gel of the quantity and type seen at Fort Randall formed when New Oil was used to replace Old Oil.

Interrogatory Number 3:

Did the dam sites at Chief Joe, Washington and Ozark, Arkansas, within the last ten (10) years, develop alleged problems similar to those alleged in the above-captioned matter subsequent to the replacement of turbine lubricating oil?

Response:

Defendant objects that the term "similar" and "problems" are vague. Defendant further states that the Chief Joe and Ozark dams did not experience problems with gel that was settling throughout the power generating system or forming in barrels of oil that had not been used.

<u>Interrogatory Number 4</u>:

For those dam sites identified in Interrogatory No. 2, please:

A. Describe the alleged problems that developed subsequent to the replacement of turbine lubricating oil.

B. State what was determined to be the cause of the alleged problems; and

C. Identify the people or entities involved with the determination of the cause of the alleged problems.

<u>Response</u>:

Defendant restates its objections to the vagueness of Interrogatory No. 2 and reiterates that no dam of which it is aware manifested the development of gel of the same type, and to the same degree, as was true of the Fort Randall site.

Interrogatory Number 8:

Identify other dam sites, within the last ten (10) years, which developed alleged problems of any kind subsequent to the replacement of turbine lubricating oil.

Response:

Defendant objects to this interrogatory as unduly burdensome to the extent that it involves several federal agencies and departments outside of the United States Army Corps of Engineers, Omaha District. Defendant further objects to the questions based on the vagueness and ambiguity of "alleged problems of any kind" . Defendant finally objects to this interrogatory because it is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to matters that relate to the subject matter of the lawsuit.

Interrogatory Number 9:

Did the dam sites at Chief Joe, Washington and Ozark, Arkansas, within the last ten (10) years, develop alleged problems of any kind subsequent to the replacement of turbine lubricating oil?

Response:

Defendant objects that the phrase "problems of any kind" is vague and requests information that is impermissably broad and burdensome. Without waiving this objection, Defendant incorporates by reference its response to Interrogatory Nos. 11 and 13.

Interrogatory Number 23:

For each date identified in the United States' answer to Interrogatory No. 22, the Defendant, the United States, replaced one type of oil with a different type of oil in the turbine generating units and governors at the Fort Randall Project, Pickstown, South Dakota or any of its other dam sites, please:

A. Identify the site or sites at which one type of oil was replaced with a different type of oil.

B. For each site at which one type of oil was replaced with a different type of oil, please state the number of times a different type of replacement oil, from that which was being replaced, was used.

C. For each site at which one type of oil was replaced with a different type of oil, please state, on each occasion this occurred, what type of oil was being removed and what type of oil was being installed into the turbine generating units and governors.

D. For each site at which one type of oil was replaced with a different type of oil, please state, on each occasion this occurred, the problems if any, encountered by the Defendant, the United States.

Response:

Defendant objects to this interrogatory as unduly burdensome to the extent that it involves several federal agencies and departments outside of the United States Army Corps of Engineers, Omaha District. Defendant further objects to this interrogatory because it is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to matters that relate to the subject matter of the lawsuit. With regards to the Fort Randall:

A. Fort Randall Project, Pickstown, South Dakota

B. At the Fort Randall Project, a Group I turbine oil was replaced by a Group II turbine oil,

which then apparently was replaced by a mixture of Group I and Group II turbine oils, which finally was replaced by a Group I turbine oil.

C. In looking at the answers to Interrogatory 22 herein:

1. September 16-October 9, 1998: Group I removed, Group II installed

2. May 21-27, 1999 and June 10, 1999: Group II removed, mixture of Group I and Group II being installed

3. October 29-November 5, 1999: Group II removed, Group I installed (Unit 8 bearings); mixture of Group I and Group II removed, Group I installed (Unit 8 governor system)

4. February 4-7, 2000: mixture of Group I and Group II removed, Group I installed (Unit 3 governor system)

5. February 25-March 9, 2000: Group II removed, Group I installed (Unit 2 bearings); mixture of Group I and Group II removed, Group I installed (Unit 2 governor system)

6. March 22-April 14, 2000: Group II removed, Group I installed (Unit 7 bearings); mixture of Group I and Group II removed, Group I installed (Unit 7 governor system)

7. April 24-May 24, 2000: Group II removed, Group I installed (Unit 4 bearings); mixture of Group I and Group II removed, Group I installed (Unit 4 governor system)

8. May 30-June 1, 2000: mixture of Group I and Group II removed, Group I installed (Unit 3 bearings)

9. August 16-September 23, 2000: Group II removed, Group I installed (Unit 6 bearings); mixture of Group I and Group II removed, Group I installed (Unit 6 governor system)

10. October 13-November 15, 2000: Group II removed, Group I installed (Unit 1 bearings); mixture of Group I and Group II removed, Group I installed (Unit 1 governor system)

11. June 6-11, 2001: Group II removed, Group I installed (Unit 5 bearings); mixture of Group I and Group II removed, Group I installed (Unit 5 governor system).

D. In looking at the answers provided for Interrogatory 22 herein:

1. September 16-October 9, 1998:

On October 1, 1998, Allied delivered 6,000 gallons of New Oil. On this date, Fort Randall Project personnel first observed that the new oil being supplied by Allied was beginning to cloud up with a white substance. After having taken some samples of the oil, Fort Randall Project personnel noted that when a sample sat undisturbed in a clear container, a cloud formed near the bottom the container. The cloud disappeared when the sample was shaken. The Corps of Engineers promptly notified Allied about this problem. Despite the continued cloudiness problem, Allied continued replacing the Old Oil in the generating units, supplying 5,033 gallons of New Oil on October 6, 1998, and 1,500 gallons of New Oil on November 2, 1998.

On February 22, 1999, Fort Randall Project personnel shut down Turbine Unit No. 5 in order to perform routine preventative maintenance. On the next day, Fort Randall Project plant mechanics discovered that the filters in the unit's governor system were clogged completely with a grease-like gel material. Subsequently, Fort Randall Project personnel checked the governor filters of several other turbine units, and they found the same gel was clogging those filters.

On March 10, 1999, representatives from the Army Corps. of Engineers, Omaha District, Allied, and Warren discussed the serious problems being caused by the additive package, including the gel that was clogging the governor filters. Everyone agreed that the anti-foaming additive was not staying in solution. The parties also agreed that the gel would not have formed had the anti-foaming additive

actually remained in solution. After having a chemical analysis done on the gel sample taken on February 25, 1999, and discovering that it was predominantly silicone-based, Warren admitted that the gel was caused by a reaction by the anti-foaming additive that had settled out. Allied Oil and the Corps of Engineers agreed that the gel also had formed on the bottom of 55 gallon barrels containing New Oil that was never installed in any units, as well as within containers storing samples taken of the New Oil for testing. .

On April 19, 1999, Fort Randall Project personnel took Turbine Unit No. 3 out of service for routine maintenance and for replacement of the thrust bearing oil coolers. In examining the interior of the unit, Fort Randall Project personnel found nearly all of the machinery surfaces of the thrust bearing housing to be covered completely with the gel substance, which measured over a quarter of an inch thick in some areas. Since their installation at the Fort Randall Project, plant personnel had inspected each of the turbine units every other year, while performing routine preventative maintenance, and had never found any prior evidence of a foreign substance accumulating in any of the units.

2. May 21-27, 1999 and June 10, 1999:

From April 29, 1999, through June 10, 1999, Allied delivered 11,172 gallons of Replacement Oil to the Fort Randall Project. This Replacement Oil was an equal mixture of the previously-utilized Group II hydrocracked oil and Group I solvent-refined oil.

On June 19, 1999, a Fort Randall Project power plant mechanic noticed sediment floating in the samples of the Replacement Oil that had been installed in Turbine Unit No. 3 and all of the governor systems. Warren and the Corps of Engineers each took samples of the oil and sediment for analysis and testing. On August 4, 1999, the Corps of Engineers had the results of its

laboratory testing of the replacement oil that had been installed into Turbine Unit No. 3 and the governor systems. While the Corps of Engineers was unable to determine exactly what the sediment was, it determined that the replacement oil did not meet the emulsion requirements of the Contract.

On August 10, 1999, power plant mechanics checked the oil filters in the governor systems, and they found a new substance clogging these filters. It was a clearer and less viscous gel than the one previously found in Turbine Unit No. 3 and the governor systems.

On August 18, 1999, the Corps of Engineers took additional samples of the Replacement Oil from Turbine Unit No. 3 and the governor systems, in order to verify that the replacement oil did not comply with the Contract's requirements. The Corps of Engineers sent the samples for laboratory testing on August 19, 1999, and the results came back on September 23, 1999, that the Replacement Oil again failed to meet the emulsion requirements of the Contract.

3. October 29-November 5, 1999:

On October 29, 1999, Allied delivered 6,500 gallons of Second Replacement Oil to flush out the powerhouse oil lines and refill the bearings and governor systems for both Turbine Unit No. 3 and Turbine Unit No. 8. Allied drained the Second Replacement Oil from its delivery truck into the Fort Randall plant lube oil system, and the Corps of Engineers took samples from Tanks #1 and #4 as the oil left the truck. The laboratory testing results for these samples were that the samples failed the water-separability test.

Allied had taken its own samples from each tank prior to delivering the oil, and Warren similarly had taken samples from their main storage tank. Both Allied and Warren furnished these samples to the Corps of Engineers for laboratory testing. While some of this Second

Replacement Oil already had been installed in the bearings and governor system of Turbine Unit No. 8, most of it remained in the clean oil tank of the power plant. Therefore, the Corps of Engineers took its own samples from each of these locations. After the laboratory testing was completed, only the sample from Allied failed to pass the oil-water separation tests.

4. February 4-7, 2000:

On February 4, 2000, Allied delivered Second Replacement Oil to the Fort Randall Project for use in Turbine Unit No. 3. The Corps of Engineers took samples of the oil and drove them to Omaha for laboratory testing. As had previously occurred, the Second Replacement Oil failed the water-separability test. In order to confirm these results, the Corps of Engineers then took samples directly from Allied's truck, and these samples similarly failed.

9.August 16-September 23, 2000:

Fort Randall Project personnel took Turbine Unit No. 6 out of service on August 14, 2000. Allied delivered 3,500 gallons of second replacement oil on August 16, 2000. The Corps of Engineers had samples of the oil taken from the truck both in Omaha, before delivery, and at the Fort Randall Project power plant. Subsequent laboratory testing showed that the oil in compartment #5 of the truck failed the water-separability test and had a high water content. Because some of the oil from compartment #5 had mixed with oil from compartment #1 when it was drained from the truck at the power plant, the Corps of Engineers decided to run the oil through the plant's oil purification unit in an attempt to remove the water. The Second Replacement Oil from compartment #5 then passed the laboratory test.

11. June 6-11, 2001:

Fort Randall Project personnel took Turbine Unit No. 5 out of service on February 20, 2001.

Allied previously had delivered 6,100 gallons of Second Replacement Oil on February 14, 2001. Prior to shipment, the Corps of Engineers tested samples from the three truck compartments that contained the oil. Because the samples barely met the water-separability requirements, the Corps of Engineers allowed Allied to send the truck on to the Fort Randall Project. At Fort Randall, the Corps of Engineers took additional samples from the truck's compartments for testing. Only two of the three compartments still met the water-separability requirements.

The Corps of Engineers proceeded to take two more samples of the Second Replacement Oil from the truck compartment; one sample from the top of the compartment and the other sample from the bottom. The bottom sample failed the emulsion test. After Allied had further testing done by a laboratory in Texas, the Corps of Engineers proposed running the non-compliant oil from that one compartment through the power plant's oil purification unit. To ensure that this oil did not mix with any other oil in the plant, Allied placed the non-compliant oil in dry, clean plastic containers on March 28, 2001. The Corps of Engineers ran this oil though the purification unit on April 6, 2001. After the "purification" process was completed, the Corps of Engineers then took samples of the oil and sent them to its Omaha laboratory for testing on April 10, 2001. The test results later showed marginal compliance with the emulsion requirements.

On May 31, 2001, the Corps of Engineers ran the oil through the purification unit a second time. Although the samples taken after this second "purification" still only marginally passed the emulsion test, the Corps of Engineers decided to accept the shipment as having passed the laboratory tests.

DEFENDANT'S RESPONSES

Document Request No. 1:

All contracts within the course of the last ten (10) years with The United States for the delivery of turbine lubricating oil to dam sites such as, but not limited to, the Fort Randall Project, Pickstown, South Dakota.

Response:

Defendant objects to this request as unduly burdensome to the extent that it calls for the production of documents from several federal agencies outside of the United States Army Corps. of Engineers, Omaha District. Defendant also objets that this request is vague in that it fails to define the meaning of the term "such as". Defendant further objects that this is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to documents that relate to the subject matter of the lawsuit. With regard to the Fort Randall Project, Pickstown, South Dakota, the contract at issue in this matter is the only contract for the delivery of turbine lubricating oil that has been awarded in the last ten years. The Contract is produced herein at Bates Nos. 2-14.

Document Request No. 2:

Those documents, over the course of the last ten (10) years, which identify, discuss or related to claims by the Defendant, The United States, that an individual and/or entity has failed to supply turbine lubricating oil which complies with contract specifications regarding emulsion; and/or, in which The United States has claimed that an individual and/or entity has supplied turbine lubricating oil containing an anti-foaming additive that failed to remain in solution and formed a gel within turbine generating units and/or governors.

Response:

Defendant objects to this request as unduly burdensome to the extent that it calls for the production of documents from several federal agencies outside of the United States Army Corps. of Engineers, Omaha District. Defendant further objects to this request because it is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to documents that relate to the subject matter of the lawsuit. With regard to the Fort Randall Project, Pickstown, South Dakota, the documents provided in response to the foregoing Request for Production of Documents are the documents that identify, discuss, or relate to the contracting officer's decision produced herein at Bates Nos. 1-188.

Document Request No. 17:

For those dam sites, within the last ten (10) years, for which the Defendant, The United States, is or was responsible, that developed alleged problems similar to those alleged in the above-captioned matter subsequent to the replacement of turbine lubricating oil, please produce:

A. Those documents addressing, describing or relating to the alleged problems.

B. Those documents addressing, describing or relating to the cause of the alleged problems.

C. Those documents addressing, describing or relating to the damages, if any, The United States incurred as a result of the alleged problems; and

D. Those documents describing or relating to the solutions The United States determined would address the alleged problems.

Response:

Defendant objects that the term "similar" is vague and ambiguous. Defendant further objects to this request as unduly burdensome to the extent that it might call for the production of documents from several federal agencies outside of the United States Army Corps of Engineers, Omaha District. Defendant finally objects to this request because it is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to documents that relate to the subject matter of the lawsuit. Subject to these objections, Defendant avers that it is not aware of any other dam sites that developed problems with the gel Substance of the type and amount that formed on the Fort Randall dam after the use of New Oil.

Document Request No. 20:

If the dam sites at Chief Joe, Washington and/or Ozark, Arkansas, within the last ten (10) years, developed alleged problems of any kind subsequent to the replacement of turbine lubricating oil, please produce:

A. Those documents addressing, describing or relating to the alleged problems.

B. Those documents addressing, describing or relating to the cause of the alleged problems.

C. Those documents addressing, describing or relating to the damages, if any, The United States incurred as a result of the alleged problems; and

D. Those documents describing or relating to the solutions The United States determined would address the alleged problems.

Response:

Defendant objects that the term "problems of any kind" is vague and ambiguous. Defendant further objects that this request is unduly burdensome in that it requests information on beyond the scope of this lawsuit and not likely to lead to the discovery of admissible evidence.

Document Request No. 25:

Those documents which identify, discuss or relate to the dates, within the last ten (10) years, the Defendant, The United States, replaced one type of oil with a different type of oil in the turbine generating units and governors at the Fort Randall project, Pickstown, South Dakota or any of its other dam sites, including, for each such date:

A. Those documents that identify the site or sites at which one type of oil was replaced with a different type of oil.

B. For each site at which one type of oil was replaced with a different type of oil, those documents that identify, discuss or relate to the number of times a different type of replacement oil, from that which was being replaced, was used.

C. For each site at which one type of oil was replaced with a different type of oil, and for each occasion this occurred, those documents that identify, discuss or relate to the type of oil that was being removed and the type of oil that was being installed into the turbine generating units and governors.

D. For each site at which one type of oil was replaced with a different type of oil, and for each occasion this occurred, those documents that identify, discuss or relate to the problems, if any , encountered by the Defendant, The United States.

Response:

Defendant objects to this request as unduly burdensome to the extent that it calls for the production of documents from several federal agencies outside of the United States Army Corps. of Engineers, Omaha District. Defendant further objects to this request because it is unlikely to lead to the discovery of admissible evidence insofar as it is not restricted to documents that relate to the subject matter of the lawsuit. With regard to the Fort Randall Project, Pickstown, South Dakota, documents responsive to this request are produced herein at Bates Nos. 1-188.