IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

ALLIED OIL & SUPPLY, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

and

WARREN DISTRIBUTION, INC.,

Third-Party Defendant.

No. 03-2673 C

Chief Judge Edward J. Damich

**REPLY BRIEF IN SUPPORT OF MOTION FOR ENLARGEMENT OF FACT DISCOVERY DEADLINE FOR THE PURPOSE OF SERVING A SUBPOENA UPON CHEMOPTIX, LLC**

## I. INTRODUCTION

In the Government's brief, the Government argues that Third-Party Defendant Warren Distribution's ("Warren") request to serve a single subpoena upon Chemoptix, LLC ("Chemoptix") should be rejected on relevance grounds because of the "manifest uniqueness of the phenomena at Fort Randall that gave rise to this litigation." (Gov't Brief, p. 7). Unfortunately for the Government, the Government's own chemist wrote an unsolicited report stating that what happened at the Chief Joseph Powerhouse constituted "the same pattern of events . . . as those described at Fort Randall." (Warren Opening Brief, Ex. 1; Micetic Dep. 107:6-18).

The standard under RCFC 26(b)(1) for the discoverability of evidence is whether the discovery "is relevant to the claim or defense of any party." RCFC 26(b)(1). Mr. Micetic wrote a report and testified that he thought what happened at Chief Joseph was similar or the same as what happened at Fort Randall which gives rise to the Government's claims in this case. The Court should grant Warren's Motion.

## II. STATEMENT OF FACTS

Warren incorporates the facts and arguments in its Brief in Support of its Motion. Although Warren disputes many statements the Government makes in the "Statement of Facts" section of its brief, Warren finds a few of the Government's statements particularly incorrect.

The Government states in its brief that "Mr. Schlott has since testified that nothing has changed Warren Distribution's opinion that the likely cause of the gel was anti-foaming additive falling out or contamination after purchase." (Gov't Brief, p. 2; citing Schlott Dep. p. 39-40). Mr. Schlott does not say this in the testimony cited by the Government, or anywhere else in his

deposition. In the pages cited by the Government, Mr. Schlott instead discusses the probability of contamination of the oil after the oil left Warren's premises:

> Q. Well, in that letter you refer to the possibility that there may have been contaminates in the system or in transport or after they left Warren; is that correct?
>
> A. That's correct.
>
> * * *
>
> Q. The possibility that there were contaminates that got into the oil after it left Warren distribution?
>
> A. Yes. We felt that that was, that was part of the issue.
>
> Q. Did anything else occur that changed your thinking—
>
> A. No.
>
> Q. – after that letter was written?
>
> A. No. I think—our thinking has continued to be—supported that the cause for the problems had to do with contamination that occurred after the oil left our premises.

(Gov't Ex. D; 39:9-40:11).

The Government states in its brief that "[t]he President of Allied Oil, Mr. Conrad Heinson, testified that discussions with Mr. Schlott showed that Mr. Schlott was aware of additive falling out of the oil." (Gov't Brief, p. 2; citing Heinson Dep., p. 53). The Government's statement is misleading.

In the part of Mr. Heinson's testimony cited by the Government, Mr. Heinson testified:

> Q. Okay. Do you recall Mr. Schlott discussing with you partial fallout of the silicone-based antifoaming agent?
>
> A. General discussion. I can't recall anything specific to this.
>
> Q. Do you recall anything in general about it?

A. He was aware of it. That's about all I recall of it.

(Gov't Ex. B, Heinson Dep. 53:12-20).

Furthermore, on the next page of his deposition, Mr. Heinson specifically speaks to the statement Government claims he made, and states that he does not recall what Mr. Schlott said on that issue:

> Q. Okay. I believe the sentence says, "We readily acknowledge that some drop out of the silicone antifoam occurred. . ." Do you recall Mr. Schlott making any acknowledgement to you?
>
> Mr. Buescher: Object to form and foundation.
>
> A. I don't remember what Schlott told me in regard to that.

(Reply Ex. A; Heinson Dep. 54:6-14).

The Government states in its brief that "[a]n employee of Allied Oil has testified that the President of Warren Distribution, Mr. Robert Schlott . . . stated that Warren Distribution had used an additive and that 'he had insufficient information and research resulting in [the] problem with [the] additive.'" (Gov't Brief p. 2). Not only is this hearsay, but it is also misleading. Mr. Schlott has no recollection of ever saying this. (Reply Ex. B; Schlott Dep. p. 32-33).

The Government uses testimony of Gary Christian, an Allied employee, to identify an alleged statement of Conrad Heinson "that replacement oil would be supplied because the oil Warren Distribution had initially supplied was 'off spec.'" (Gov't Brief, p. 3 and Attach. A at 43). However, the Government fails to point out that Mr. Christian later clarified what he meant by the term "off spec," and the fact that he could not comment on what Mr. Heinson was thinking when he allegedly used the term "off spec":

> Q. Today you have used the term "off spec." When you use that term, what do you mean?

A. It's just a term that we use in the industry that really doesn't mean anything. Yeah, it really doesn't mean anything. Like I stated before, there's no analysis or anything. It means we're going to return something, in our business.

***

Q. When you use that term, you're not saying that the oil was not what it was supposed to be?

***

A. That is correct.

Q. I believe you may have made reference that Conrad Heinson used that term in a conversation with you. You do not know what Mr. Heinson was thinking when he used that term, do you?

***

A. No, I didn't know what was - - what he was thinking of.

Q. And when you use that term, you're not stating that the oil here did not meet the specifications of this contract; is that correct?

***

A. That is correct.

(Reply Ex. C; Christian Dep. 97:20-99:17).

## III. ARGUMENT

### A. The Test Results Sought Here Easily Meet the Discoverability Standard of RCFC 26(b)(1)

RCFC 26(b)(1) states that "[p]arties may obtain discovery regarding any matter . . . that is relevant to the claim or defense of any party[:]"

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

RCFC 26(b)(1) (West 2005).

"Relevance for the purposes of Rule 26 is broadly construed." *Jade Trading, LLC v. United States*, 65 Fed.Cl. 487, 491 (Ct. Fed. Cl. 2005).

Further, the standard for "discoverable evidence" is less stringent than that for "admissible evidence." *Shell Petroleum, Inc. v. United States*, 47 Fed. Cl. 812, 817 (Ct. Fed. Cl. 2000) ("[T]he Plaintiff points out that 'admissible evidence' encompasses a narrower scope of material than the standard for 'discoverable evidence' found in RCFC 26(b)(1).").

Mr. Micetic's report and testimony discuss a similarity between the events and property damage that occurred at Chief Joseph Powerhouse in the State of Washington and Fort Randall Powerhouse in the State of South Dakota. The requested tests directly relate to information that may be relevant to the cause of the alleged property damage at Fort Randall. RCFC 26 allows Warren to obtain discovery relating to the "defense of any party[.]"

The Government claims Warren never disputed the Government's objections to Warren's document requests seeking documents related to alleged problems at other dam sites subsequent to the replacement of turbine lubricating oil, including the Chief Joseph Powerhouse. (Gov't Brief, p. 4). This is assertion is not correct.

In May, 2005, counsel for Warren indicated it was entitled to the documents responsive to these requests for production. (Warren Opening Brief, p. 10 and Ex. 4). Warren did not take further issue with the Government's objections to the above-discussed document requests, because Warren accepted the Government's proposal that the parties wait "'until Micetic's deposition before [the Government would] throw down the gauntlet and declare that [the Government would] not produce [the documents sought by Warren's Request[s] . . .] and before [Warren] makes demands for such information.'" (Warren Opening Brief, p. 10 and Exs. 5 & 6).

The Government re-iterated this position in July, 2005, when counsel for the Government stated that "Micetic's deposition would 'give . . . a clearer idea of what the scope of further discovery [would] be.'" (Warren Opening Brief, pp. 10-11 and Ex. 8).

In light of the foregoing, the Government's assertion that Micetic's deposition was intended to only resolve the issue of obtaining discovery regarding the alleged problems at other dam sites subsequent to the replacement of turbine lubricating oil through deposition, and had nothing to do with obtaining documents related to this issue, is, also, in correct. (Gov't Brief, pp 4-5).

As set-forth by both the Government and Warren, Micetic's deposition did not take place until August 31, 2005. The Government contends that "[d]uring two subsequent rounds of depositions . . . Warren did not renew its effort to expand discovery to other dam sites." (Gov't Brief, pp. 5-6). A rough draft of the transcript for Micetic's deposition and a final transcript were not available until September 6, 2005 and September 12, 2005, respectively. (Warren Opening Brief, p. 12). These transcripts of Micetic's deposition became available in the midst of a two (2) week block of depositions that ended on September 16, 2005. (Warren Opening Brief, p. 12). After the conclusion of this two (2) week block of depositions, and after having an opportunity to adequately review the transcript of Micetic's deposition, counsel for Warren, on September 27, 2005, made a very limited, narrowed and focused request for production of the testing records for the substance at the Chief Joseph Powerhouse in light of Micetic's testimony and as responsive to Warren's above-discussed document requests. (Warren Opening Brief, p. 12 and Ex. 14).

The Government asserts that "Warren Distributions' Motion is an expansive proposal made to appear modest." (Gov't Brief, p. 7). Without any basis, the Government asserts that

"there is no reason to believe that . . . [Warren's request to obtain the testing records for the substance at the Chief Joseph Powerhouse] would end with this motion." (Gov't Brief, p. 7). Contrary to the Government's assertions, there is nothing expansive about Warren's Motion. Warren's Motion is a very limited, narrowed and focused request to obtain the testing records, for tests performed by Chemoptix, LLC, regarding the substance found in the Chief Joseph Powerhouse.

Based on the facts and arguments set-forth in Warren's Opening Brief and this Reply Brief, justice requires allowing Warren to obtain the testing records, for tests performed by Chemoptix, LLC, regarding the substance found in the Chief Joseph Powerhouse.

## IV. CONCLUSION

Based on the foregoing, Warren respectfully requests that the Court grant its Motion for Enlargement of the Fact Discovery Deadline for the Purpose of Serving a Subpoena upon Chemoptix, LLC.

Dated this 3rd day of November, 2005.

WARREN DISTRIBUTION, INC., Third-party Defendant

By: s/Dennis J. Moynihan by Brian Buescher

Dennis J. Moynihan
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
(402) 346-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

James D. Colt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Classification Unit
1100 L Street, NW
Room 8032
Washington, D.C. 20530
James.colt@usdoj.gov

Brian D. Nolan, Esq.
Nolan, Olson, Hansen & Lautenbaugh, LLP
The Exchange Building
1905 Harney Street
Suite 800
Omaha, NE 68102
bnolan@nolanolson.com

s/Dennis J. Moynihan by Brian Buescher
Dennis J. Moynihan